RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0036p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PETER CARL BORMUTH,

>*Plaintiff-Appellant,*

*v.*

COUNTY OF JACKSON,

>*Defendant-Appellee.*

No. 15-1869

---

Appeal from the United States District Court for
the Eastern District of Michigan at Detroit.
No. 2:13-cv-13726—Marianne O. Battani, District Judge.

Argued: April 19, 2016

Decided and Filed: February 15, 2017

Before: MOORE, GRIFFIN, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gregory M. Lipper, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amicus Curiae. Richard D. McNulty, COHL, STOKER & TOSKEY, P.C., Lansing, Michigan, for Appellee. Peter Bormuth, Jackson, Michigan, pro se. **ON BRIEF:** Gregory M. Lipper, Richard B. Katskee, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amicus Curiae. Richard D. McNulty, COHL, STOKER & TOSKEY, P.C., Lansing, Michigan, for Appellee. Peter Bormuth, Jackson, Michigan, pro se.

MOORE, J., delivered the opinion of the court in which STRANCH, J., joined. GRIFFIN, J. (pp. 34–64), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   The Board of Commissioners in Jackson County, Michigan begins its monthly meetings with a prayer.   Peter Bormuth, a resident of Jackson County, filed suit against the County asserting that this prayer practice violates the First Amendment's Establishment Clause.   The district court granted the County's motion for summary judgment and denied Bormuth's motion for summary judgment, and Bormuth now appeals.   We hold that the district court erred in rejecting Bormuth's argument that the prayer practice coerced residents to support and participate in the exercise of religion.   Accordingly, we **REVERSE** the district court's grant of summary judgment to the County and **REMAND** for entry of summary judgment in Bormuth's favor and for further proceedings consistent with this opinion.

## I. BACKGROUND

The facts in this case are not in dispute.   The Jackson County Board of Commissioners has nine members, including a Chairman, who are elected by the people of Jackson County.   In addition to overseeing other Jackson County bodies, the Board of Commissioners holds monthly meetings to address matters of local concern.   Each meeting begins with a call to order, after which the Chairman directs those in attendance to "rise" and "assume a reverent position."   R. 10 (Am. Compl. ¶¶ 17, 19) (Page ID #64–65).   Then one of the Commissioners—all of whom are Christian—delivers a prayer.   *Id.* ¶¶ 19–23 (Page ID #64–66).   Immediately after the prayer, the Board of Commissioners invites residents, often children, to lead attendees in the Pledge of Allegiance.   *Id.* ¶ 17 (Page ID #64).   The Board of Commissioners' meetings are open to the public and, for citizens who are unable to attend, are videotaped and posted on Jackson County's website.   *Id.* ¶ 16 (Page ID #64).

Bormuth is a self-described Pagan and Animist.   *Id.* ¶ 13 (Page ID #63).   He believes in the "attribution of conscious life to objects in and phenomena of nature" and the "existence of spirits separable from bodies."   *Id.* (emphasis removed) (internal quotation marks omitted).

Bormuth worships the Sun and the Moon, as well as ancestral spirits, but his "primary deity is the Mother Earth." *Id.* He has written essays, poetry, and music on the subject. *Id.* Deeply concerned with environmental issues, Bormuth started attending the Board of Commissioners' monthly meetings because he believed that the County was releasing pollutants into a local river. *Id.*

In July 2013, Bormuth attended the Board of Commissioners' meeting to speak about closing the Jackson County Resource Recovery Facility, the mass-burn waste combustor that he believed was polluting the local river. *Id.* ¶ 25 (Page ID #66–67). At the meeting, after the Chairman said "all rise," one of the Commissioners gave the following prayer:

> Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna [sic] give you all the thanks and all the praise for all that you do. Lord I wanna [sic] remember bereaved families tonight too, that you would be with them and take them through difficult times. We ask these things in your son Jesus's name. Amen.

*Id.* ¶ 23 (Page ID #65–66). As a Pagan and an Animist, Bormuth was uncomfortable with the Commissioner's prayer. *Id.* ¶ 24 (Page ID #66). He felt like he was being forced to participate in a religion to which he did not subscribe in order to bring a matter of concern to his local government. *Id.*

Bormuth attended the Board of Commissioners' August 2013 meeting as well. *Id.* ¶ 28 (Page ID #68). A Commissioner opened the meeting with the following prayer:

> Please rise. Please bow our heads. Our heavenly father we thank you for allowing us to gather here in your presence tonight. We ask that you watch over us and keep your guiding hand on our shoulder as we deliberate tonight. Please protect and watch over the men and women serving this great nation, whether at home or abroad, as well as our police officers and firefighters. In this we pray, in Jesus name, Amen.

*Id.* During the prayer, Bormuth was the only one in attendance who did not rise and bow his head. *Id.* ¶ 29 (Page ID #68). Bormuth felt isolated, and he worried that the Board of Commissioners would hold against him his decision to stay seated. *Id.*

On the agenda for the August 2013 meeting was whether Jackson County employees with concealed-weapons permits could carry handguns at work. *Id.* ¶ 30 (Page ID #68–69). Following a discussion of Second Amendment rights, the Board of Commissioners voted in favor of the County employees who wished to carry handguns at work. *See id.* During the public-comment period, Bormuth stood and addressed the Board of Commissioners, calling attention to what he believed was an equally important constitutional issue: First Amendment rights. *Id.* ¶ 31 (Page ID #69). Bormuth told the Commissioners that he thought that the monthly prayers violated the Establishment Clause and criticized the Commissioners for selectively following the Bill of Rights. *Id.* While Bormuth was speaking, one of the Commissioners "made faces expressing his disgust" and then turned his chair around, refusing to look at Bormuth while he spoke. *Id.* The Commissioner's reaction "confirm[ed] [Bormuth's] fear[]" that his refusal to join the prayers would prejudice the Board of Commissioners against him. *Id.* Bormuth filed suit against the County ten days later, alleging that the prayer practice violated the Establishment Clause. R. 1 (Compl.) (Page ID #1).

While Bormuth's suit was pending before the district court, the Board of Commissioners nominated residents to the County's new Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had applied to serve on the Solid Waste Planning Committee, and had three years of experience working on related issues, the Board of Commissioners did not nominate him. *Id.* Bormuth surmised that this had something to do with his suit against the County. Indeed, an article published shortly after Bormuth filed his federal complaint revealed the Commissioners' disapproval of the suit, quoting one Commissioner as saying, "Bormuth 'is attacking us and, from my perspective, my Lord and savior Jesus Christ,'" and another Commissioner as remarking, "All this political correctness, after a while I get sick of it." R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149). Bormuth filed an amended complaint addressing the Board of Commissioners' decision not to nominate him to the Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). He again alleged that the

County was violating the Establishment Clause and asked for declaratory and injunctive relief as well as nominal damages. *Id.* ¶¶ 37, 44–50 (Page ID #70–71, 83–84).

Bormuth moved for summary judgment a month later. R. 14 (Pl. First Mot. for Summ. J.) (Page ID #107). In response, the County asked the district court to hold the case in abeyance pending the Supreme Court's decision in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). R. 16 (Def. Resp. to Pl. First Mot. for Summ. J. at 18) (Page ID #173). The district court did not hold the case in abeyance, but it did not rule on the motion for summary judgment either, and in May 2014 the Supreme Court issued its decision in *Town of Greece*. The County filed a motion for summary judgment in light of the Court's opinion. R. 25 (Def. Mot. for Summ. J.) (Page ID #244). The district court terminated Bormuth's first motion for summary judgment and invited him to file a second motion for summary judgment addressing *Town of Greece*, which he did. R. 32 (Order Terminating Mot. at 1–2) (Page ID #430–31); R. 37 (Pl. Second Mot. for Summ. J.) (Page ID #509).

While the parties were briefing their motions for summary judgment, they were also embroiled in two discovery disputes. The first dispute involved Bormuth's efforts to take depositions. Bormuth sent the County notices of his intent to depose the Commissioners, R. 24-2 (Notices of Deps.) (Page ID #226), in order to obtain "information relating to [Bormuth's] activities regarding the Jackson County Resource Recovery Facility," as well as information on the Board of Commissioners' practice of opening meetings with prayer and on its use of children to lead the Pledge of Allegiance following the prayer, R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The County filed a motion to quash, arguing that it had already provided Bormuth with all the information that it had on its practice of opening meetings with prayer and on its use of children to lead the Pledge of Allegiance, and that any information it had on Bormuth's activities regarding the Jackson County Resource Recovery Facility was immaterial. R. 24 (Mot. to Quash at 3–7) (Page ID #213–17). In response, Bormuth stated that he also wanted to uncover the Commissioners' motives in delivering the prayers. R. 26 (Resp. to Mot. to Quash at 7) (Page ID #296). The County replied that the Commissioners' motives were also immaterial. R. 28 (Reply re: Mot. to Quash at 1) (Page ID #306).

The second dispute involved Bormuth's efforts to supplement the record. Bormuth sought to supplement the record with the text of a Commissioner's October 2014 prayer, R. 42 (Pl. First Mot. to Suppl. Record at 1) (Page ID #790), and with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works, R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). The County objected to the first motion to supplement the record because the October 2014 prayer was similar to the prayers that Bormuth had included in his amended complaint. R. 43 (Resp. to Pl. First Mot. to Suppl. Record at 1–2) (Page ID #801–02). The County did not respond to the second motion to supplement the record, which was filed just days before the Magistrate Judge issued a Report and Recommendation.

The Magistrate Judge considered the County's motion to quash depositions first. Although not persuaded by the County's arguments that the information Bormuth sought was immaterial, the Magistrate Judge granted the motion "because both sides ha[d] fully briefed their respective summary judgment motions and responses, and plaintiff ha[d] not indicated the need for any additional discovery." R. 46 (Order Granting Mot. to Quash at 6) (Page ID #820). The Magistrate Judge addressed the parties' motions for summary judgment in another order, recommending that the district court deny the County's motion for summary judgment, grant Bormuth's motion for summary judgment because "the legislative prayer practice of the Jackson County Board of Commissioners violates the Establishment Clause," and enjoin the Board of Commissioners from "utilizing its current prayer practice." R. 50 (R. & R. at 39) (Page ID #914). Finally, the Magistrate Judge denied without prejudice Bormuth's motions to supplement the record because the Magistrate Judge had already recommended that the district court grant summary judgment in Bormuth's favor. R. 54 (Order Denying Mots. to Suppl. Record at 1) (Page ID #998).

The district court rejected the Magistrate Judge's recommendations. Beginning with the motion to quash depositions, the district court agreed with the County that the information Bormuth sought in deposing the Commissioners—"information relating to [Bormuth's] activities regarding the Jackson County Resource Recovery Facility," R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236)—was not germane to the dispute, R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2–3) (Page ID #1045–46). Confusing the Jackson County Resource

Recovery Facility with the Solid Waste Planning Committee (or possibly with the Board of Public Works), the district court explained that because Bormuth "ha[d] not brought an employment discrimination claim," "information regarding the Jackson County Resource Recovery Facility's failure to hire him . . . is not relevant." *Id.* The district court further stated that although Bormuth also sought information on the Commissioners' motives in giving the prayers, "motive is not a relevant factor." *Id.* at 3 (Page ID #1046). The district court then granted Bormuth's first motion to supplement the record with the Commissioner's October 2014 prayer but denied Bormuth's second motion to supplement the record with the letter that he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 2–3) (Page ID #1048–49). Conflating Bormuth's second motion to supplement the record with his efforts to depose the Commissioners, the district court described the second motion to supplement the record as seeking to introduce "[Bormuth's] application to a position on the Jackson County Resource Recovery Facility," concluding that, "[b]ecause [Bormuth's] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, his affidavit describing the Board's failure to hire him is irrelevant." *Id.* at 3 (Page ID #1049) (emphasis removed).

The district court then turned to the merits of Bormuth's Establishment Clause claim. The district court considered the content of the Board of Commissioners' prayers first, and concluded that, although the prayers were "exclusively Christian," they were composed of only "benign religious references"—making Bormuth's reaction to them "hypersensitive." R. 61 (Dist. Ct. Op. at 7–8) (Page ID #1057–58). "The fact that all nine of the Commissioners are Christian," the district court stated, "is immaterial, [because] [a]s elected officials, they were chosen as representatives whose interests were most closely aligned with the public's, and their personal beliefs are therefore a reflection of the community's own overwhelmingly Christian demographic." *Id.* at 7 (Page ID #1057). Turning to whether the Board of Commissioners' practice was coercive, the district court noted that Bormuth could have left the room during the prayers, and that nothing in the record indicated that his absence would have been perceived as disrespectful. *Id.* at 12–13 (Page ID #1062–63). Accordingly, the district court held that "Bormuth's subjective sense of affront resulting from exposure to sectarian prayer is insufficient

to sustain an Establishment Clause violation." *Id.* at 13 (Page ID #1063) (emphasis removed). Although the district court acknowledged that some citizens may not perceive statements such as "rise" and "assume a reverent position," *see, e.g.*, R. 10 (Am. Compl. ¶ 19) (Page ID #64–65), as the mere "voluntary invitations" that the district court believed they were, the district court did not discuss the point further, R. 61 (Dist. Ct. Op. at 13–14) (Page ID #1063–64). As for the Commissioners' treatment of Bormuth, the district court stated that, though "evidence of disrespect," the Commissioners' treatment by turning their backs to him "does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer—rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited by his sentiments." *Id.* at 15 (Page ID #1065).

Bormuth timely appeals the district court's order granting the motion to quash, its order denying the second motion to supplement the record, and its order granting the County's motion for summary judgment and denying Bormuth's motion for summary judgment. R. 65 (Notice of Appeal) (Page ID #1072).

## II. ANALYSIS

### A. Whether the District Court Abused its Discretion by Granting the Motion to Quash and Denying the Motion to Supplement the Record

This court reviews for an abuse of discretion both a district court's ruling on a motion to quash and its ruling on a motion to supplement the record. *Guy v. Lexington-Fayette Urban Cty. Gov't*, 624 F. App'x 922, 928 (6th Cir. 2015) (motion to quash); *see Duha v. Agrium, Inc.*, 448 F.3d 867, 882 (6th Cir. 2006) (motion to supplement the record). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) (internal quotation marks omitted).

In granting the County's motion to quash the depositions of the Commissioners, the district court concluded that, because Bormuth "ha[d] not brought an employment discrimination claim," "information regarding the Jackson County Resource Recovery Facility's failure to hire

him . . . is not relevant." R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2–3) (Page ID #1045–46). This was a misapprehension of the facts. Bormuth had not sought information regarding the Jackson County Resource Recovery Facility's failure to hire him. He had sought information about his efforts to close it: the Jackson County Resource Recovery Facility was the mass-burn waste combustor that Bormuth believed was polluting the local river. R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The district court also concluded that, to the extent Bormuth sought information on the Commissioners' motives in giving the prayers, "motive is not a relevant factor." R. 59 (Dist. Ct. Order Granting Mot. to Quash at 3) (Page ID #1046). This was a misapplication of the law. The Commissioners' purpose in delivering the prayers is highly relevant, because legislative prayer that is intended to proselytize may violate the Establishment Clause by coercing citizens to support and participate in the exercise of religion. *Town of Greece*, 134 S. Ct. at 1825–26 (controlling opinion). The district court's order, therefore, was an abuse of discretion.

In denying Bormuth's second motion to supplement the record—which asked the district court to consider the letter that Bormuth received from the Board of Commissioners denying him appointment to the Board of Public Works—the district court also misapprehended the facts and misapplied the law. The district court characterized Bormuth's second motion to supplement the record as seeking to introduce "his application to a position on the Jackson County Resource Recovery Facility." R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 3) (Page ID #1049). But as explained above, Bormuth never applied for a position at the Jackson County Resource Recovery Facility; he attempted to close it. His second motion to supplement the record concerned his application to the Board of Public Works. R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). The district court then concluded that "[b]ecause [Bormuth's] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, [the letter and] affidavit describing the Board's failure to hire him [are] irrelevant." R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 3) (Page ID #1049) (emphasis removed). But the letter and affidavit are relevant—they speak to whether the Board of Commissioners is allocating benefits and burdens based on citizens' participation in the prayers, which is a critical part of the analysis of legislative-prayer claims. *See Town of Greece*, 134 S. Ct. at 1826 (controlling opinion). Accordingly, the district court's order denying the

motion to supplement the record was also an abuse of discretion.  However, because we find that Bormuth is entitled to summary judgment as a matter of law on the record that was before the district court, both of the district court's errors are harmless.

**B.    Whether the Board of Commissioners' Practice Violates the Establishment Clause**

   **1.  Framework**

Before considering the merits of Bormuth's arguments, we must first set forth the framework within which to analyze his claim.  Unfortunately, our sources are limited.  There are only two Supreme Court cases that have considered the constitutionality of legislative prayer—*Marsh v. Chambers* and *Town of Greece*—and neither one provides much instruction beyond establishing that legislative-prayer claims occupy a unique place in First Amendment jurisprudence.

*Marsh*, the first Supreme Court case to consider a legislative-prayer claim, bypassed the Court's previously constructed tests for Establishment Clause violations, reasoning that because "the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom," from "colonial times through the founding of the Republic and ever since," those tests did not apply.  463 U.S. 783, 786 (1983).  The Court held that a new formal test was unnecessary.  As the Court explained, "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."  *Id.* at 792.  Although the Court still asked whether any features of the practice before it violated the Establishment Clause, it evaluated the parties' arguments "against the historical background" of legislative prayer.  *Id.* at 792–93.

*Town of Greece* confirmed that "*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted."  134 S. Ct. at 1819.  However, *Town of Greece* cautioned that "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation."  *Id.*  "The case teaches instead that the Establishment Clause must be interpreted by reference to historical practices and understandings."  *Id.* (internal

quotation marks omitted).  Following the framework set forth in *Marsh*, the Court in *Town of Greece* considered whether the legislative prayer before it "fit[] within the tradition long followed in Congress and the state legislatures."  *Id.*  Examining the prayer "against the backdrop of historical practice," *Town of Greece* asked whether the prayer violated the Establishment Clause by either being sectarian, *id.* at 1820, or coercive, *id.* at 1825 (controlling opinion).  The Court found that while sectarian prayers would not necessarily violate the Establishment Clause, coercive prayer practices would.  *Id.* at 1821, 1825.

Thus, we must determine whether the Board of Commissioners' practice is similar to the practices upheld in *Marsh* and *Town of Greece* or if there are critical differences that bring the Board of Commissioners' practice outside the ambit of historically tolerated legislative prayer. Legislative prayer may fall outside the bounds of the Establishment Clause if it strays too far from its traditional purpose and effect—respectful solemnification—or if it is unconstitutionally coercive.  *Id.* at 1827 (courts should determine whether legislative prayers "comport with the tradition of solemn, respectful prayer approved in *Marsh*, or whether coercion is a real and substantial likelihood").  *Town of Greece* provided several indicators of how a legislative prayer practice might stray from this traditional purpose, including patterns of proselytization, denigration, discrimination, or censorship of religious speech.  *Id.* at 1821–24.  Alternatively, a legislative prayer practice might be unconstitutionally coerciced "if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity."  *Id.* at 1826.

## 2.   A Closer Look at *Marsh* and *Town of Greece*

Because we must compare the Board of Commissioners' practice to the practices upheld in *Marsh* and *Town of Greece* in order to determine whether the Board of Commissioners' practice also falls within the tradition of legislative prayer, a closer look at both cases is necessary.

### a. *Marsh*

*Marsh* concerned the Nebraska Legislature's practice of opening its sessions with a prayer delivered by a chaplain. 463 U.S. at 784. Although the Nebraska Legislature could choose a new chaplain biennially, the same chaplain, a Presbyterian minister, had been giving the prayers for sixteen years. *Id.* at 784–85. He was also paid with public funds. *Id.* The Supreme Court's opinion provided little additional detail on the Nebraska Legislature's practice, instead observing that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786. Indeed, Nebraska had adopted the practice before it had even achieved statehood. *Id.* at 789–90. The Supreme Court concluded that the Nebraska practice fell within the scope of historically tolerated legislative prayer and that no features of the practice—including that the chaplain was paid with public funds—violated the Establishment Clause. *Id.* at 792–95.

### b. *Town of Greece*

*Town of Greece* provides more points of comparison. In 1999, the Town of Greece started opening its monthly town board meetings with prayers delivered by local clergy. 134 S. Ct. at 1816. Unlike in *Marsh*, the clergy were volunteers whom the town typically contacted through their local congregations. *Id.* Although the town never "excluded or denied an opportunity to a would-be prayer giver," the town recruited exclusively Christian clergy for eight years. *Id.* Susan Galloway and Linda Stephens, residents of the Town of Greece, attended the monthly board meetings and objected to the prayers' Christian content. *Id.* at 1817. In response, the town invited a Jewish layman and the chairman of the local Baha'i temple to offer invocations. *Id.* The town also accepted a request to deliver a prayer from a Wiccan priestess, who had read about the controversy in the news. *Id.*

Galloway and Stephens filed a complaint alleging that the town's practice violated the Establishment Clause "by preferring Christians over other prayer givers and by sponsoring sectarian prayers, such as those given 'in Jesus' name.'" *Id.* (quoting *Galloway v. Town of Greece*, 732 F. Supp. 2d 195, 203 (W.D.N.Y. 2010)). They did not, however, seek to enjoin the town's practice in its entirety, "but rather requested an injunction that would limit the town to

'inclusive and ecumenical' prayers that referred only to a 'generic God' and would not associate the government with any one faith or belief." *Id.* (quoting *Galloway*, 732 F. Supp. 2d at 210, 241). Galloway and Stephens believed "that the setting and conduct of the town board meetings create[d] social pressures that force[d] nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor[ed] the prayer and . . . vote[d] on matters citizens [brought] before the board." *Id.* at 1820. They further argued that "[t]he sectarian content of the prayers compound[ed] the subtle coercive pressures . . . because the nonbeliever who might tolerate ecumenical prayer [was] forced to do the same for prayer that might be inimical to his or her beliefs." *Id.* The district court found no Establishment Clause violation, *Galloway*, 732 F. Supp. 2d at 243, and the Second Circuit reversed, *Galloway v. Town of Greece*, 681 F.3d 20, 34 (2d Cir. 2012).

The Supreme Court reversed the Second Circuit in an opinion written by Justice Kennedy. The first half of Justice Kennedy's opinion, which garnered a majority of the Court, held that Galloway and Stephens's insistence on inclusive and ecumenical prayer was inconsistent with *Marsh*. *Town of Greece*, 134 S. Ct. at 1820–24. The Court explained that *Marsh* had held that the use of prayer to open legislative sessions was constitutional not because the prayer was nonsectarian, but because "prayer in this limited context could 'coexist with the principles of disestablishment and religious freedom.'"[1] *Id.* at 1820 (alteration omitted) (quoting *Marsh*, 463 U.S. at 786). Indeed, the Court noted that the prayers given by one of the Senate's first chaplains were sectarian and warned that "[t]he decidedly Christian nature of these prayers must not be dismissed as the relic of a time when our Nation was less pluralistic than it is today." *Id.*

The Court also expressed concern that Galloway and Stephens's proposed cure would be worse than the disease:

> To hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's

---

[1]The Court also repudiated dicta in *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter* characterizing *Marsh* as proscribing sectarian prayer. *Town of Greece*, 134 S. Ct. at 1821–22.

current practice of neither editing or approving prayers in advance nor criticizing
their content after the fact.

*Id.* at 1822. The Court was quick to note, however, that there were still constraints on the content of legislative prayer. *Id.* at 1823. These constraints came from the prayer's purpose, which is to solemnize the legislative session. *Id.* If the prayer's content strayed from this purpose, the prayer would no longer be consistent with the First Amendment. But "[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer [would] not likely establish a constitutional violation."**2** *Id.* at 1824.

The second half of Justice Kennedy's opinion, which was joined by only two other Justices, considered Galloway and Stephens's argument that the town's practice was coercive— specifically, that it pressured members of the public to participate in the prayers in order to appease town board members. *Id.* at 1824–28 (controlling opinion). Justice Kennedy's opinion agreed that this kind of pressure was problematic, stating that "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise." *Id.* at 1825 (quoting *Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)). However, the opinion stated that there was no evidence of coercion in the record. The opinion explained that the inquiry into whether the government has engaged in such coercion is "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.* By "offering a brief, solemn, and respectful prayer to open its monthly meetings," the Town of Greece had not "compelled its citizens to engage in a religious observance." *Id.* "[L]egislative prayer," the opinion explained, "has become part of our heritage and tradition," and "[i]t is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize." *Id.* The opinion determined that there was nothing

---

**2**Because this is one of the Court's more concrete statements, it is tempting to turn it into a test and apply it to the County's prayer practice, as the County endeavors to do in its brief. *See* Appellee Br. at 23, 25. The Court's statement, however, must be viewed through the lens of Galloway and Stephens's insistence that legislative prayers be ecumenical. In other words, the statement is limited to challenges based on content alone.

in the record about the setting of the prayer that undermined this presumption. *Id.* As for the principal audience to whom the prayer was directed, the opinion explained that it is presumed that the principal audience is the lawmakers themselves, because legislative prayer is "an internal act" in which government officials invoke the divine for their own benefit rather than to promote religion to the public. *Id.* (quoting *Chambers v. Marsh*, 504 F. Supp. 585, 588 (D. Neb. 1980)). Again, the opinion determined that there was nothing in the record about the principal audience that undermined this presumption. *Id.* at 1825–26.

The opinion then observed, importantly for our purpose, that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Id.* at 1826. The opinion further noted that "[n]othing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined," and finally, that "[i]n no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished." *Id.*

Before we determine whether the Board of Commissioners' practice falls within the bounds of historically tolerated legislative prayer, we must take a short detour. As noted above, the Court in *Town of Greece* was divided: although four Justices signed on to the first half of Justice Kennedy's opinion, only two Justices signed on to the second half. Thus, while Justice Kennedy's analysis of the respondents' content-based argument garnered a majority of the Court, Justice Kennedy's analysis of the respondents' coercion argument did not. Complicating matters, Justice Thomas filed an opinion concurring in part and concurring in the judgment, which Justice Scalia joined, advancing a different theory as to the kind of coercion required to violate the First Amendment's Establishment Clause.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)

(opinion of Stewart, Powell, and Stevens, JJ.)).  Thus, we must determine whether Justice Kennedy's or Justice Thomas's conception of coercion constitutes the narrowest grounds.

Although the Supreme Court has applied the "narrowest grounds" rule a number of times, most extensively in *Marks v. United States* and *Gregg v. Georgia*, it has never actually defined the term.  Accordingly, we undertook the task in *United States v. Cundiff*, which applied the "narrowest grounds" rule to *Rapanos v. United States*, 547 U.S. 715 (2006), in order to answer a jurisdictional question.  *Cundiff*, 555 F.3d 200, 208–09 (6th Cir. 2009).  After a detailed examination of *Marks* and *Gregg*, *Cundiff* held,

> As these cases indicate—and contrary to assertions by the Cundiffs and their *amici*—*Marks* does not imply that the "narrowest" *Rapanos* opinion is whichever one restricts jurisdiction the most.  But it also makes little sense for the "narrowest" opinion to be the one that restricts jurisdiction the least, as the government's *amici* allege; the ability to glean what substantive value judgments are buried within concurring, plurality, and single-Justice opinions would require something like divination to be performed accurately.  Instead, "narrowest" opinion refers to the one which relies on the "least" doctrinally "far-reaching-common ground" among the Justices in the majority:  it is the concurring opinion that offers the least change to the law.

*Id.* at 209 (internal citation omitted).  An examination of *Gregg* and *Marks* confirms our understanding of the rule.[3]

*Gregg* interpreted the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), where a majority of the Court held that Georgia's death penalty was unconstitutional. *See Gregg*, 428 U.S. at 168–69.  The *Furman* Court, however, could not agree on a rationale. The five Justices in the majority all filed separate concurring opinions:  Justices Douglas, Stewart, and White concluded that the death penalty was unconstitutional as applied; Justices Brennan and Marshall concluded it was per se unconstitutional.  *Gregg* held that "[s]ince five Justices wrote separately in support of the judgments in *Furman*, the holding of the Court may be

---

[3]In *Cundiff*, we acknowledged that the "narrowest grounds" rule is only "workable" where "one opinion can be meaningfully regarded as 'narrower' than another."  *Cundiff*, 555 F.3d at 209 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).  Here, the rule can be applied without too much difficulty.

viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds—Mr. Justice Stewart and Mr. Justice White."**4** *Id.* at 169 n.15.

Marks interpreted *Memoirs v. Massachusetts*, 383 U.S. 413 (1966), a similarly fractured opinion which reversed a state court's declaration that a book was obscene. *Marks*, 430 U.S. at 193. In order to determine which *Memoirs* opinion was based on the narrowest grounds, *Marks* broke *Memoirs* down into its constituent parts. *Id.* at 193–94. In *Memoirs*, Justice Brennan, joined by Chief Justice Warren and Justice Fortas, wrote the opinion reversing the state court, Justices Black and Stewart concurred in the reversal for reasons stated in prior dissenting opinions, and Justice Douglas wrote a separate opinion concurring in the judgment. *Marks* concluded that Justice Brennan's plurality opinion represented the narrowest grounds. *Id.* Before *Memoirs*, the controlling opinion on obscenity defined "obscene material" as "material which deals with sex in a manner appealing to prurient interest." *Roth v. United States*, 354 U.S. 476, 487 (1957). Justice Brennan's plurality opinion set forth a three-part test which incorporated this definition of obscenity. *Marks*, 430 U.S. at 193–94. The other Justices concurred based on their belief either that only hard-core pornography can be suppressed, or that the First Amendment provides an absolute shield against restrictions of obscene material. *Id.* Justice Brennan's plurality opinion, therefore, "offer[ed] the least change to the law." *Cundiff*, 555 F.3d at 209.

Reading *Marks* and *Gregg* with *Cundiff*, we are left with one question: which analysis of coercion in *Town of Greece*—Justice Kennedy's or Justice Thomas's—"relies on the least doctrinally far-reaching-common ground among the Justices in the majority?" *Cundiff*, 555 F.3d at 209 (internal quotation marks omitted). The answer is Justice Kennedy's analysis. Although Justice Thomas's conception of coercion is more *restrictive*, Justice Kennedy's conception of coercion "offers the least change to the law." *Id.*

---

**4**Although Justice Douglas also concluded that the death penalty was unconstitutional as applied, he described the discretionary statutes at issue as "pregnant with discrimination." *Furman*, 408 U.S. at 256–57 (Douglas, J., concurring). Justice Stewart's discussion of race was more measured: "My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. But racial discrimination has not been proved, and I put it to one side." *Id.* at 310 (Stewart, J., concurring) (footnotes omitted) (internal citations omitted). Justice White did not address race in his opinion. *Id.* at 310–14 (White, J., concurring).

As discussed above, Justice Kennedy's opinion in *Town of Greece* states that "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise,'" a quote the opinion draws from *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*. *Town of Greece*, 134 S. Ct. at 1825 (controlling opinion) (quoting *Cty. of Allegheny*, 492 U.S. at 659 (Kennedy, J., concurring in judgment in part and dissenting in part)).  Justice Kennedy's opinion further supports this statement with a citation to the plurality opinion in *Van Orden v. Perry*, where the Supreme Court held that "institutions must not press religious observances upon their citizens."  *Id.* (quoting *Van Orden*, 545 U.S. 677, 683 (2005)).  After finding no coercion in the record, Justice Kennedy's opinion observes that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity."  *Id.* at 1826.  Thus, Justice Kennedy's opinion leaves the door open to coercion-based challenges to legislative prayer based on context and setting.

Justice Thomas's opinion concurring in part and concurring in the judgment states that "the municipal prayers at issue in this case bear no resemblance to the coercive state establishments that existed at the founding."  *Id.* at 1837.  Justice Thomas's opinion continues: "The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*."  *Id.* (emphasis in original) (quoting *Lee v. Weisman*, 505 U.S. 577, 640 (1992) (Scalia, J., dissenting)).  The remainder of Justice Thomas's opinion cites only Justice Thomas's previous concurrences from cases where there were controlling majority or plurality opinions.  *Id.* at 1837–38.  Whatever the merits of Justice Thomas's arguments, he does not cite any controlling law to support them.  Indeed, in his opinion concurring in the judgment in *Elk Grove Unified School District v. Newdow*, Justice Thomas criticizes the Supreme Court's concern with "subtle coercive pressure" in the Establishment Clause context, acknowledging that the Court has not accepted his conception of the kind of coercion required to violate the Establishment Clause. 542 U.S. 1, 45–46 (2004) (Thomas, J., concurring in the judgment) (quoting *Lee*, 505 U.S. at 592).

Admittedly, the precise role of coercion in an Establishment Clause inquiry is unclear, especially within the context of legislative prayer. In that sense, both Justice Kennedy's and Justice Thomas's opinions involve at least some departure from the state of the law as it existed before *Town of Greece*. However, given that there is controlling precedent supporting Justice Kennedy's opinion and no controlling precedent supporting Justice Thomas's concurrence, Justice Thomas's concurrence is neither the "the least doctrinally far-reaching-common ground among the Justices in the majority," nor the "opinion that offers the least change to the law." *Cundiff*, 555 F.3d at 209 (internal quotation marks omitted). What is more, when viewed within the context of the majority's holding, Justice Kennedy's opinion clearly represents the narrowest grounds. The majority's holding was that there was no coercion. According to Justice Kennedy, this was because there was no coercion *in the record*. According to Justice Thomas, this was because there could *never* be coercion absent formal legal compulsion. Within the context of a ruling against the respondents, therefore, the narrower opinion is Justice Kennedy's, not Justice Thomas's. Accordingly, Justice Kennedy's conception of coercion is the holding of the Court under binding Sixth Circuit precedent.

### 3. Whether the Board of Commissioners' Practice Falls Within the Tradition of Legislative Prayer

We now turn to whether the Board of Commissioners' practice falls within the tradition of legislative prayer. It does not. A combination of factors distinguishes this case from the practice upheld in *Marsh* and *Town of Greece*, including one important factor: the identity of the prayer giver. In *Marsh*, the Nebraska legislature opened its session with a prayer offered by a chaplain, 463 U.S. at 784; in *Town of Greece*, invited clergy and laypersons delivered the invocations, 134 S. Ct. at 1816–17. Here, the Jackson County Commissioners give the prayers. *See* R. 10 (Am. Compl. ¶¶ 19–23) (Page ID #64–66). The difference is not superficial. When the Board of Commissioners opens its monthly meetings with prayers, there is no distinction between the government and the prayer giver: they are one and the same. The prayers, in

Bormuth's words, are literally "governmental speech."**[5]** R. 29 (Pl. Resp. to Def. Mot. for Summ. J. at 1) (Page ID #318).

Legislator-led prayer at the local level falls far afield of the historical tradition upheld in *Marsh* and *Town of Greece*. The setting of the prayer practice by the Jackson County Board of Commissioners—a local governing body with constituent petitioners in the audience—amplifies the importance of the identity of the prayer giver in our analysis, and heightens the risks of coercion, as borne out by the facts in this case. *See infra* at 33–34 [¶¶ 68–69]; *see also Town of Greece*, 134 S. Ct. at 1826 (distinguishing solicitations to pray by guest ministers from those by town leaders, noting that "[t]he analysis would be different if town board members" themselves engaged in the same actions).

### a. Whether the Board of Commissioners' Practice Strays from the Traditional Purpose and Effect of Legislative Prayer: Respectful Solemnification

The identity of the prayer giver distinguishes the Board of Commissioners' practice from the practices upheld in *Marsh* and *Town of Greece* and leads to other problems with the Board of Commissioners' practice. Because they are the ones delivering the prayers, the Commissioners—and only the Commissioners—are responsible for the prayers' content. *See id.* And because that content is exclusively Christian, by delivering the prayers, the Commissioners are effectively endorsing a specific religion.**[6]**

---

**[5]**The dissent says that it does not matter that the prayers are literally government speech because "[a] public official need not be the one giving a prayer in order for the Establishment Clause to apply." Dissent at 49. In support of that statement, the dissent cites *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009). *Pleasant Grove City* is about the Free Speech Clause, not the Establishment Clause; in fact, it specifically distinguishes the Establishment Clause. *See id.* at 467–68. More importantly, nothing in *Pleasant Grove City*, nor in any cases about the Establishment Clause, changes the fact that the identity of the prayer giver is a relevant consideration in the highly "fact-sensitive" Establishment Clause inquiry. *See Town of Greece*, 134 S. Ct. at 1825.

**[6]**The dissent argues that whether the Commissioners endorse a particular religion is irrelevant because the *Lemon* test does not apply to this case. Dissent at 47. While we agree that we do not need to apply the *Lemon* test in this case, we disagree that whether the Commissioners' prayer practice endorses one religion over others is entirely irrelevant. *Town of Greece* indicates that "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation" and that "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." 134 S. Ct. at 1819, 1823. Endorsing a specific religion can be part of a pattern of denigrating religious minorities or preaching conversion.

There are no opportunities for persons of other faiths to counteract this endorsement by offering invocations. In *Town of Greece*, the Supreme Court upheld the town's prayer practice in large part because it included prayers representing a variety of faiths. Although initially all of the prayer givers were Christian ministers, eventually the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver invocations. *See Town of Greece*, 134 S. Ct. at 1817. When a Wiccan priestess asked for an opportunity to deliver the invocation, the town granted her request. *Id*. The Supreme Court emphasized that, "The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one." *Town of Greece*, 134 S. Ct. at 1824; *see also id*. at 1829 (Alito, J., concurring) ("[T]he town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation. . . . The most recent list in the record of persons available to provide an invocation includes representatives of many non-Christian faiths."). In Jackson County, there is no opportunity for members of other faiths to offer invocations. Instead, there are exclusively Christian prayer givers and a pattern of explicitly Christian prayers.

What is more, the prayer givers are exclusively Christian because of an intentional decision by the Board of Commissioners. Unlike in *Town of Greece*, where the Court found no evidence of sectarian motive in the selection of speakers, at least one Jackson County Commissioner admitted that, in order to control the prayers' content, he did not want to invite the public to give prayers. At a November 2013 meeting of the Personnel & Finance Committee, one of the Commissioners imagined what would happen if any Jackson County resident could lead the prayer:

> We all know that any one of us could go online and become an ordained minister in about ten minutes. Um, so if somebody from the public wants to come before us and say that they are an ordained minister we are going to have to allow them as well.

County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47–38:01).[7] He continued:

> And I think we are opening a Pandora's Box here because you are going to get members of the public who are going to come up at public comment and we are going to create a lot of problems here when certain people come up here and say things that they are not going to like.

*Id.* at 38:02–38:16. These comments reveal that the Board of Commissioners' control over the content of the prayers is not just a function of the Commissioners' role as prayer givers—it is the result of an affirmative decision by the Commissioners to exclude *other* prayer givers.[8] The Board of Commissioners, in other words, is limiting who can give the prayers in order to control the prayers' content.[9] And the effect is preventing participation by religious minorities and

---

[7]This video, like the other videos we cite in our opinion, was part of the record before the district court. *See* R. 10 (Am. Compl. ¶ 16) (Page ID #64) (informing the district court that the County records the Board of Commissioners' meetings and posts the videos on the County's website); R. 29 (Pl. Resp. to Def. Mot. for Summ. J. at 11–16) (Page ID #328–33) (reciting what happened at several Board of Commissioners' meetings, videos of which the County posts online); R. 37-1 (Pl. Mot. for Summ. J., Ex. J) (Page ID #611–614 (including transcripts of three Board of Commissioners' meetings and stating that the County posts videos of Board of Commissioners' meetings online). Indeed, as counsel for the County stated at oral argument, the "official record" includes all of the videos of the Board of Commissioners' meetings. Despite the fact that Bormuth repeatedly references the videos and recites what happened at Board of Commissioners' meetings in his pleadings, the dissent contends that these videos are not part of the record. For that proposition, it cites *United States v. Crumpton*, 824 F.3d 593 (6th Cir. 2016). In *Crumpton*, the defendant "refer[red] to a video of the execution of the search warrant[.] . . . The video *was not made part of the district court's electronic record*, however, *nor was it forwarded to this court* for purposes of appeal. Because the video has not been made part of the record before us, *we cannot evaluate its effect* on the case." *Id.* at 614 n.6 (emphasis added). There is an obvious distinction between *Crumpton* and this case: In *Crumpton*, we determined that we could not evaluate the video's effect because we did not have access to the video. That determination is entirely distinct from the one we are making here, which is that the parties have made the videos, which we can access, part of the record by repeatedly referencing them in pleadings.

[8]The dissent cautions against "examining the minds of individual legislators as it relates to legislative intent" and advocates "heed[ing] the Supreme Court's admonition that '[i]nquiries into [legislative] motives or purposes are a hazardous matter.'" Dissent at 50. Presumably the dissent is not arguing that legislative purpose and motive are irrelevant. "Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country, and governmental purpose is a key element of a good deal of constitutional doctrine." *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 861 (2005) (citation omitted). More likely, the dissent is arguing against relying too much on mere inferences about the motives of individual legislators. Here, we need not rely on inferences because there are clear statements expressing the desire to control the content of prayers. Moreover, *McCreary*, which the dissent relies on for support, indicates that "scrutinizing purpose does make practical sense, as in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." 545 U.S. at 862. No psychoanalysis is necessary in this case because there are discoverable facts in the form of clear statements and actions that reveal the Commissioners' motives.

[9]The dissent argues that, "Noticeably absent from the majority's opinion is any acknowledgement that Jackson County's invocation practice is facially neutral regarding religion" even though "[n]either other

endorsing a specific religion.   This brings the County's use of prayer to open its monthly meetings well outside the ambit of historically tolerated legislative prayer.

Amicus offers another way in which the Board of Commissioners' practice differs from previously upheld practices:  its purpose is to promote religion to the public.  The Supreme Court found that the prayers in *Town of Greece* were "intended to place town board members in a solemn and deliberative frame of mind," 134 S. Ct. at 1816, and that this was in line with historical practice, as the purpose of legislative prayer is to "accommodate the spiritual needs of lawmakers," *id.* at 1826 (controlling opinion).  Amicus contends, however, that the Jackson County Commissioners cannot claim that their prayers are purely "an internal act."  *Id.* at 1825 (quoting *Chambers*, 504 F. Supp. at 588).  According to Amicus, "[t]he *only* meeting of the full Board of Commissioners during the past two years when no prayer was offered was the meeting that no members of the public attended."  Amicus Br. at 12 (citing County of Jackson, *November 6, 2014 Special Jackson County Board of Commissioners Meeting Video*, YouTube (Nov. 7, 2014), http://tinyurl.com/2014nov6 (0:01–0:47)).  Thus, although *Town of Greece* stated that prayer should not be used "to afford government an opportunity to proselytize or force truant constituents into the pews," 134 S. Ct. at 1825 (controlling opinion), Amicus insists that the County is doing exactly that:  "when members of the public are present, it preaches to them and directs them to participate; when only the Commissioners are present, they omit the prayer entirely," Amicus Br. at 13.

Bormuth has waived this argument, and Amicus cannot make it for him.  "While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties." *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 560 (6th Cir. 2016) (alteration omitted) (quoting *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998)), *cert. denied*, --- U.S. ---, 2017 WL 69264 (U.S. Jan. 9, 2017) (No. 16-593).  Although Bormuth argued both that the Board of Commissioners' practice "has the effect of proselytizing . . . and advancing the Christian religion," R. 10 (Am. Compl. at 19) (Page ID #78), and that the prayers were "directed at the audience," R. 29 (Pl. Resp. to Def. Mot.

---

Commissioners, nor the Commission as a whole, review or approve the content of the invocations."  Dissent at 46. This acknowledgement is absent from our opinion because, as the affirmative decision to exclude other prayer givers makes plain, Jackson County's invocation practice purposefully discriminated against non-Christian prayer givers.

for Summ. J. at 14) (Page ID #331), he did not explicitly argue that the Commissioners' purpose was to promote religion to the public.  And although we are mindful of our rule that pro se filings should be construed liberally, *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005), we decline to ground our analysis in Amicus's argument.

We hold that the Board of Commissioners' practice strays from the traditional purpose and effect of legislative prayer.  A confluence of factors distinguishes the Jackson County practice from the practices upheld in *Marsh* and *Town of Greece*.  These factors include the deliverance of the invocations by the Commissioners themselves in a local setting with constituent petitioners in the audience, as well as the Board's intentional decision to exclude other prayer givers in order to control the content of the prayers.  We now consider, as a second "independent but mutually reinforcing reason[]" why the prayer practice here falls outside the protective umbrella of tradition, whether the Board of Commissioners' practice is coercive. *Town of Greece*, 134 S. Ct. at 1820.  And as stated above, we proceed with the understanding that Justice Kennedy's conception of coercion is controlling.

### b.  Whether the Board of Commissioners' Practice Is Unconstitutionally Coercive

As the controlling opinion of the Court held in *Town of Greece*, "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Id.* at 1825 (quoting *Cty. of Allegheny*, 492 U.S. at 659 (Kennedy, J., concurring in judgment in part and dissenting in part)).  The inquiry into whether the government has violated this principle is "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.*  Although the Court in *Town of Greece* concluded that there was no evidence of coercion in the record before it, it held that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Id.* at 1826.  All three elements are present here.

First, the Board of Commissioners directs the public to participate in the prayers at every monthly meeting.  As the Supreme Court has observed, the source of these statements is

significant.  In *Town of Greece*, "board members themselves stood, bowed their heads, or made the sign of the cross during the prayer," but "*they at no point solicited similar gestures by the public.*"  *Id.* (emphasis added).  Rather, it was the clergy who asked audience members to participate in the prayer.  *Id.*  The Supreme Court reasoned that, because this direction came from the clergy, it was inclusive, not coercive.  *Id.*  Here, it is the Board of Commissioners, and the Board of Commissioners only, that tells the public to join in the prayer.  What is more, these instructions are almost always from the Chairman.  *See, e.g.,* R. 10 (Am. Compl. ¶¶ 19–23) (Page ID #64–66).  The Chairman presides over the meeting; his words are cloaked in procedural formality.  The words "rise" and "assume a reverent position" from the Chairman, therefore, are not mere suggestions, they are commands.  But even in the infrequent instances where it is the Commissioner giving the prayer who tells the public to "rise" or to "bow [their] head[s]," R. 29-1 (Pl. Resp. to Def. Mot. for Summ. J., Ex. E ¶¶ 9, 13, 22) (Page ID #370–71), the effect is the same:  to coerce the public to participate in the exercise of religion.

This coercion is compounded by the setting in which it is exerted.  *See Town of Greece*, 134 S. Ct. at 1825 (controlling opinion).  Local government meetings are small and intimate.  And unlike in federal and state legislative sessions, where the public does not speak to the legislative body except by invitation, citizens attend local government meetings to address issues immediately affecting their lives.  Indeed, as Amicus notes, Jackson County residents have gone to the Board of Commissioners' monthly meetings to ask for funding for disabled students' transportation to school, County of Jackson, *June 18, 2013 Jackson County Board of Commissioners Meeting*, YouTube (Jun.19, 2013), http://tinyurl.com/2013jun19 (35:53–38:30), request repairs to roads leading to their homes or businesses, County of Jackson, *July 23, 2013 Jackson County Board of Commissioners Meeting*, YouTube (Jul. 24, 2013), http://tinyurl.com/2015jul23 (24:58–30:19), and redress discrimination, County of Jackson, *March 17, 2015 Jackson County Board of Commissioners Meeting*, YouTube (Mar. 18, 2015), http://tinyurl.com/2015mar17c (5:27–7:42).  Thus, there is increased pressure on Jackson County residents to follow the Board of Commissioners' instructions at these meetings, as the residents would not want to offend the local government officials they are petitioning.

Second, the Board of Commissioners has singled out Bormuth for opprobrium. During a public meeting, a Commissioner stated that Bormuth's lawsuit was an "attack on Christianity and Jesus Christ, period." County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50–32:59). Another Commissioner characterized Bormuth's lawsuit as "political correctness nonsense" and complained that he has "had political correctness jammed down [his] throat." *Id.* at 43:00–43:18. That Commissioner continued:

> The Federalist Papers, if you read them, tell[] me that it is your duty to disobey an illegal law. And it has taken some *nitwit* two hundred-and-some years to come up with an angle like this to try to deprive me or other people, of my faith, of my rights.

*Id.* at 43:22–43:41 (emphasis added). In disparaging Bormuth, the Board of Commissioners' message is clear: residents who refuse to participate in the prayers are disfavored. Indeed, when Bormuth expressed his belief that the Board of Commissioners was violating the First Amendment during the public-comment period of the August 2013 meeting, one of the Commissioners made faces and then turned his back on Bormuth, refusing even to look at Bormuth while he spoke. R. 10 (Am. Compl. ¶ 31) (Page ID #69).

Third, Bormuth has submitted evidence suggesting that the Board of Commissioners has "allocated benefits and burdens based on participation in the prayer." *See Town of Greece*, 134 S. Ct. at 1826 (controlling opinion). Shortly after Bormuth filed his complaint, Jackson County officials nominated members for the County's new Solid Waste Planning Committee from a pool of applicants. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had three years of experience working on related issues, the Board of Commissioners did not nominate him. *Id.* Given that the Commissioners had publicly expressed their contempt for Bormuth, *id.* ¶ 31 (Page ID #69); *see also* R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149), the Board of Commissioners' decision not to nominate him could easily be interpreted as a response to Bormuth's refusal to participate in the prayers. Bormuth also sought to supplement the record with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). Although Bormuth is confident that he was 'the most qualified applicant,' the Board of

Commissioners did not name him for the position.  *Id.* ¶ 6 (Page ID #933).  This rejection came just shy of a month after one of the Commissioners publicly called Bormuth a "nitwit."  *See* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (43:22–43:41).  Like the County's decision not to nominate him to the Solid Waste Planning Committee, this decision suggests that the Board of Commissioners was denying benefits to residents based on their beliefs.

Two factual details about Jackson County's prayer practice bear emphasis.  First, the Jackson County Board of Commissioners affirmatively excluded non-Christian prayer givers, and did so in an effort to control the content of prayers.  *See* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47–38:16).  Second, Commissioners attempted to silence Bormuth and insulted him for criticizing their prayer practice.  For example, when Bormuth voiced his concern about the prayer practice at a meeting, a Commissioner turned his chair around, refusing to listen to him.  R. 10 (Am. Compl. at ¶ 31) (Page ID #69).  One Commissioner said that Bormuth was "attacking . . . my Lord and savior Jesus Christ."  R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149).  Separately, a Commissioner referred to Bormuth as "a nitwit."  County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50–32:59, 43:00–43:18, 43:22–43:41).  These facts show how far Jackson County's practice strays from the historically tolerated tradition of legislative prayer.  There is no question that factual details are relevant to the Establishment Clause inquiry.  In *Town of Greece*, the Supreme Court made clear that its decision about the Town of Greece's prayer practice did not absolve courts of the duty to evaluate the constitutionality of factually distinguishable prayer practices.  "Courts remain free to review the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in *Marsh*, or whether coercion is a real and substantial likelihood."  *Town of Greece*, 134 S. Ct. at 1826–27.  "If circumstances arise in which the pattern and practice of ceremonial, legislative prayer is alleged to be a means to coerce or intimidate others, the objection can be addressed in the regular course."  *Id.* at 1826; *see also Marsh*, 463 U.S. at 795.  Jackson County's prayer practice gives rise to just those circumstances.

**C. The Dissent's Reliance on a Recent Fourth Circuit Case**

The dissent contends that its "view as to the constitutionality of Jackson County's invocation practice is consistent with the Fourth Circuit's recent opinion in *Lund v. Rowan County*." Dissent at 61. The Fourth Circuit has granted rehearing en banc in *Lund*, undercutting the persuasive value of the now-questioned panel majority. *Lund v. Rowan County*, (No. 15-1519) 2016 WL 6441047, at *1 (4th Cir. Oct. 31, 2016) (granting rehearing en banc). More importantly, regardless of the outcome of the en banc rehearing, the dissent's reliance on *Lund* falls flat for two reasons: First, Judge Wilkinson's panel dissent in *Lund* is much more convincing than the majority opinion (a view that a significant number of Fourth Circuit judges presumably share). Second, contrary to the dissent's assertion that "Rowan County's invocation practice is remarkably similar" to Jackson County's practice, there are significant factual differences. Dissent at 61. Because of these differences, even if the *Lund* majority opinion were correct that the Rowan County prayer practice complies with the Establishment Clause, the Jackson County prayer practice still violates the Establishment Clause.

On the first point, the *Lund* dissent, which is much more convincing than the majority opinion, supports our conclusions in this case. Judge Wilkinson's dissent explains, persuasively, that *Town of Greece* "in no way sought to dictate the outcome of every legislative prayer case. Nor did it suggest that 'no constraints remain on [prayer] content.'" *Lund v. Rowan Cty.*, 837 F.3d 407, 433 (4th Cir. 2016) (Wilkinson, J., dissenting) (quoting *Town of Greece*, 134 S. Ct. at 1823) (alterations in original). While Judge Wilkinson indicates that he "would not for a moment cast all legislator-led prayer as constitutionally suspect," he also understands that, per *Town of Greece*, "[t]he Establishment Clause still cannot play host to prayers that 'over time . . . denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion.'" *Lund*, 837 F.3d at 431 (Wilkinson, J., dissenting) (quoting *Town of Greece*, 134 S. Ct. at 1823). He acknowledges that, "[l]egislator-led prayer, when combined with the other elements, poses a danger not present when ministers lead prayers. The Rowan County commissioners, when assembled in their regular public meetings, are the very embodiment of the state." *Lund*, 837 F.3d at 434 (Wilkinson, J., dissenting). Accordingly, Judge Wilkinson determines that the Rowan County Board of Commissioners' prayer practice is unconstitutional because the

"combination of legislators as the sole prayer-givers, official invitation for audience participation, consistently sectarian prayers referencing but a single faith, and the intimacy of a local governmental setting exceeds even a broad reading of *Town of Greece*." *Id.* at 431.

Judge Wilkinson also rightly points out that there are many ways to solemnize a county board meeting without running afoul of the Establishment Clause. A county board "can solemnize its meetings without creating such tensions" by using "non-denominational prayers or diverse prayer-givers" or prefacing the prayer with a "Message of Religious Welcome" emphasizing that members of all religions (or no religion) are welcome in the meeting and community. *Id.* at 437–38. "Such an expression of religious freedom and inclusion would promote the core idea behind legislative prayer, 'that people of many faiths may be united in a community of tolerance and devotion.'" *Id.* at 438 (quoting *Town of Greece*, 134 S. Ct. at 1823).

The combination of factors that, according to Judge Wilkinson, renders the Rowan County Board's prayer practice unconstitutional also exists in Jackson County (and Jackson County's practice included additional factors that make it even more constitutionally suspect, as discussed below). Additionally, Judge Wilkinson's observation that a county can easily solemnize county board meetings and comply with the Establishment Clause is as true in Jackson County as in Rowan County.

On the second point, the prayer practice that we confront in this case presents even more constitutionally suspect factors than the prayer practice that the Fourth Circuit confronted in *Lund*. The factual distinctions are important because "[t]he [Establishment Clause] inquiry remains a fact-sensitive one." *Town of Greece*, 134 S. Ct. at 1825. To structure this fact-sensitive inquiry, the *Lund* panel majority focuses on four "guideposts for analyzing whether a particular practice goes beyond constitutional bounds." *Lund*, 837 F.3d at 420. Examining the facts of this case through those four guideposts shows that even if the *Lund* majority is correct that the Rowan County prayer practice complies with the Establishment Clause, the Jackson County prayer practice nevertheless violates the Establishment Clause.

Addressing the first panel guidepost, "selection of the content of legislative prayer," the *Lund* majority explains that it is important to "look[] to the activities of the legislature as a whole

in considering legislative prayer." *Id.* at 421. The *Lund* majority determines that the Rowan County Board "never altered its practice to limit a non-Christian commissioner or attempted to silence prayers of any viewpoint." *Id.* at 424. Based on this determination, the *Lund* majority concluded that, "[t]he Board's practice here, where each commissioner gives their own prayer without oversight, input, or direction by the Board simply does not present the same concerns of the 'government [attempting] to define permissible categories of religious speech.'" *Id.* at 420 (quoting *Town of Greece*, 134 S. Ct. at 1822) (emphasis and second alteration in original). Even if this assessment is correct, there is a difference between the actions of the Rowan County Board and those of the Jackson County Board: Unlike the Rowan County Board, the Jackson County Board, as a governing body, did affirmatively exclude other prayer givers in order to control the content of the prayers. *See* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47–38:16). By excluding other prayer givers to control the content of prayers, the Jackson County Board was exercising "oversight" and "'[attempting] to define permissible categories of religious speech.'" *Lund*, 837 F.3d at 420 (quoting *Town of Greece*, 134 S. Ct. at 1822) (alteration in original).

In addition, the Jackson County Board of Commissioners attempted to silence Bormuth's criticism of the prayer practice, insulting Bormuth in the process. When Bormuth complained about the prayer practice at a meeting, one of the Commissioners made a disgusted face and turned his chair around, refusing to look at Bormuth while he spoke. R. 10 (Am. Compl. at ¶ 31) (Page ID #69). Later, discussing Bormuth's complaints about the prayer practice, a Commissioner said that he "get[s] sick of" "[a]ll this political correctness" and another said that Bormuth was "attacking . . . my Lord and savior Jesus Christ." R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149). Accordingly, the Board not only purposefully excluded non-Christian prayer, but also insulted and attempted to silence Bormuth's complaints about their exclusionary prayer practice.

The Jackson County Board of Commissioners' affirmative decision to exclude other prayer givers also requires us to consider the second *Lund* panel majority guidepost, the content of the prayers, in a different light. Addressing the second guidepost, the *Lund* majority explains,

"'If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion,' a constitutional line can be crossed." *Lund*, 837 F.3d at 421 (quoting *Town of Greece*, 134 S. Ct. at 1823). Considering the content of the prayers over time, we must be mindful of the difference between unthinkingly failing to include non-Christian prayer, as the Rowan County Board apparently did, and intentionally excluding non-Christian prayer, as the Jackson County Board did. Unthinkingly excluding non-Christian prayer does not necessarily equate to denigrating other religions. The Jackson County Commissioners' affirmative decision to exclude other prayer givers to ensure that any sectarian content would be Christian, on the other hand, does denigrate other religions. Affirmative exclusion communicates that non-Christian prayers are not welcome, which communicates that non-Christians are not welcome. Affirmative exclusion also communicates that only Christian prayers are adequate to solemnize county board meetings, which communicates that other prayers are inferior. Indicating that only Christians are welcome and that other prayers are inferior denigrates other religions.

The Jackson County Board of Commissioners' affirmative decision to exclude other prayer givers is also relevant to the third *Lund* panel majority guidepost, "the selection of the prayer-giver." *Lund*, 837 F.3d at 423. The *Lund* majority notes that in *Town of Greece*, the Supreme Court upheld the town's practice because the town "'represented that it would welcome a prayer by any minister or layman who wished to give one,'" which indicated that the town "'maintain[ed] a policy of nondiscrimination.'" *Id*. (quoting *Town of Greece*, 134 S. Ct. at 1824). Even if the Rowan County Board's decision to allow only Commissioners to give prayers can somehow be characterized as "'a policy of nondiscrimination,'" the Jackson County Board did discriminate. *Lund*, 837 F.3d at 423 (quoting *Town of Greece*, 134 S. Ct. at 1824). To exclude prayers that Jackson County Commissioners did not want to hear, the Board of Commissioners forbade anyone but Commissioners from giving prayers. Excluding unwanted prayers is not a policy of nondiscrimination. Excluding unwanted prayers is discrimination.

Finally, the Jackson County Board of Commissioners' affirmative decision to exclude other prayer givers is also significant when considering the fourth *Lund* guidepost, whether "'over time'" "'the prayer practice'" was "'exploited to . . . advance any one . . . faith or belief.'"

*Lund*, 837 F.3d at 424 (quoting *Town of Greece*, 134 S. Ct. at 1823) (alterations in original). The Jackson County Board of Commissioners' affirmative exclusion of non-Christian prayers puts one faith, Christianity, in a privileged position. It ensures that only Christians will hear prayers that speak to their religious beliefs at Board of Commissioners meetings. Worse, it ensures that only Christians will hear prayers that speak to their religious beliefs because the government has singled out Christian prayer as uniquely able to solemnize these meetings. The affirmative exclusion thus advances one faith over others.

The *Lund* panel majority also concludes that Rowan County's prayer practice is not coercive. The *Lund* panel majority focuses on whether the Board "'directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity.'" *Lund*, 837 F.3d at 427 (quoting *Town of Greece*, 134 S. Ct. at 1826). Here again, factual distinctions between this case and *Lund* mean that even if the *Lund* majority is correct that the Rowan County Board of Commissioners' prayer practice is not coercive, the Jackson County Board of Commissioners' prayer practice is coercive.

Although both Boards of Commissioners directed the public to participate in prayers, there is no evidence that the Rowan County Board of Commissioners singled out dissidents for opprobrium or allowed their decisions to be influenced by a constituent's acquiescence (or refusal to acquiesce) to the prayer opportunity. The Jackson County Commissioners, on the other hand, did single out Bormuth for opprobrium. Commissioners stated that Bormuth's lawsuit was "nonsense" and "an attack on Christianity and Jesus Christ, period" and called Bormuth a "nitwit" who was "try[ing] to deprive me or other people, of my faith, of my rights." County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50–32:59, 43:00–43:18, 43:22–43:41). There is also evidence that some of Jackson County Commissioners' official decisions were influenced by Bormuth's refusal to acquiesce to the prayer opportunity. They denied Bormuth a nomination for the Solid Waste Planning Committee and, less than a month after a Commissioner publicly called him a nitwit, denied him an appointment to the Board of Public

Works.  R. 10 (Am. Compl. at ¶ 33) (Page ID #69); R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932).

The distinctions between the actions of the Jackson County Board of Commissioners in the case before us and the actions of the Rowan County Board of Commissioners in *Lund* are significant.  Because of these distinctions, even if the panel majority's opinion in *Lund* is correct, it does not influence our assessment of the facts before us in this "fact-sensitive" inquiry.  *Town of Greece*, 134 S. Ct. at 1825.

Accordingly, we hold that the Board of Commissioners' use of prayer to begin its monthly meetings violates the First Amendment's Establishment Clause.  The prayer practice is well outside the tradition of historically tolerated prayer, and it coerces Jackson County residents to support and participate in the exercise of religion.[10]

### III.  CONCLUSION

For the reasons stated above, we **REVERSE** the grant of summary judgment to the County and **REMAND** for entry of summary judgment in favor of Bormuth and for further proceedings consistent with this opinion.

---

[10]Bormuth's remaining arguments, including that the panel must apply the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), as well as the Treaty of Tripoli (a 1797 treaty with Tripolitania (now Libya) which states that "the Government of the United States of America is not, in any sense, founded on the Christian religion") are meritless.  Bormuth also does not have standing to assert an Establishment Clause violation on behalf of the children who lead attendees in the Pledge of Allegiance.  *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 489–90 (1982).

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.  Since the founding of our Republic, Congress, state legislatures, and many municipal bodies have commenced each legislative session with a prayer. Contrary to today's decision, the Supreme Court has ruled twice that legislative prayer does not violate the Establishment Clause of the United States Constitution.[1]  *Marsh v. Chambers*, 463 U.S. 783 (1983); *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).  Moreover, today's decision conflicts with the recent decision of the Court of Appeals for the Fourth Circuit upholding the constitutionality of legislator-led prayer.  *Lund v. Rowan Cty.*, 837 F.3d 407 (4th Cir. 2016).  Because the majority's opinion declaring Jackson County's invocation practice unconstitutional contravenes the First Amendment and Supreme Court precedent, I respectfully dissent.

I.

*Marsh v. Chambers* was the first Supreme Court decision upholding legislative prayer against an Establishment Clause challenge.  In *Marsh*, the plaintiffs claimed that the Nebraska Legislature's practice of opening its sessions with a prayer by its chaplain violated the First Amendment.  The salient facts of Nebraska's practice included that the chaplain was only of one denomination (Presbyterian); the Legislature selected the chaplain for sixteen consecutive years; paid him with public funds; and the chaplain gave prayers "in the Judeo-Christian tradition." 463 U.S. at 793.  The Supreme Court emphasized that these facts must be viewed against the historical background of legislative prayer, which dates back to our Republic's founding:  "The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786.  The Continental Congress, for example, "adopted the traditional procedure of opening its session with a prayer offered by a paid chaplain." *Id.* at 787.  Moreover, the First Congress "authorized the appointment of paid chaplains" for the chambers just three days before it approved the language of the First

---

[1]The Establishment Clause is applicable to the states by operation of the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *Everson v. Bd. of Ed. of Ewing Tp.*, 330 U.S. 1 (1947).

Amendment.  *Id.* at 787–88.  Given this historical foundation, the Supreme Court rejected the claim that Nebraska's invocation practice violated the Establishment Clause:  "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress."  *Id.* at 788.  Based on this "unique," "unambiguous and unbroken history . . . , the practice of opening legislative sessions with prayer has become part of the fabric of our society.  To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."  *Id.* at 791, 792.

That the Nebraska Legislature selected a chaplain of the same denomination for sixteen consecutive years was of no moment:  "Absent proof that the chaplain's reappointment stemmed from an impermissible motive," one could not "perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church."  *Id.* at 793.  Nor was it material that public funds paid for the chaplain, given that the Continental Congress did the same.  *Id.* at 794.  And finally, the Supreme Court cautioned against the judiciary "embark[ing] on a sensitive evaluation or . . . pars[ing] the content of a particular prayer."  *Id.* at 795.  That is, "[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."  *Id.* at 794–95.

*Marsh* is widely viewed as "carving out an exception" to Establishment Clause jurisprudence "because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured th[e] inquiry."  *Town of Greece*, 134 S. Ct. at 1818 (citation omitted).  This includes the generally applicable three-part *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971), test for which Bormuth advocates.  *See, e.g., Am. Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 305–06 (6th Cir. 2001) (en banc) ("It is worth mentioning, perhaps, that even the author of the *Lemon* decision, the late Chief Justice Burger, did not see fit to apply the *Lemon* test when he wrote the Court's opinion in

[*Marsh*].”); *accord Smith v. Jefferson Cty. Bd. of Sch. Commr's*, 788 F.3d 580, 589–90 (6th Cir. 2015).

Unfortunately, dicta in the *Marsh* opinion led to judicial confusion regarding its holding. This arose from a footnote in which the Court explained the "Judeo-Christian" nature of the prayers:

> [Chaplain] Palmer characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion." Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.

463 U.S. at 793 n.14.

In *County of Allegheny v. A.C.L.U.*, 492 U.S. 573 (1989), a case involving a crèche placed on the steps of a county courthouse, the Court drew a distinction between sectarian and nonsectarian references based upon this footnote. *Id.* at 603. The nonsectarian reference in *Marsh*, as "recast[]" by *County of Allegheny*, *Town of Greece*, 134 S. Ct. at 1821, led some courts, including our own, to conclude that the constitutionality of legislative prayer turned upon content neutrality. *See Stein v. Plainwell Cmty. Sch.*, 822 F.2d 1406, 1410 (6th Cir. 1987); *see also Rubin v. City of Lancaster*, 710 F.3d 1087, 1094 n.6 (9th Cir. 2013) (collecting cases). The Supreme Court corrected this error in *Town of Greece v. Galloway*.

## II.

In *Town of Greece*, the town council invited local ministers to give invocations before each town board meeting. 134 S. Ct. at 1816. The town permitted any person of any faith to give the invocation, did not review the prayers in advance, and did not provide any guidance as to tone or content. *Id.* Although some had a "distinctly Christian idiom," and for eight years only Christian ministers gave prayers, upon complaint of such pervasive themes, the town expressly invited persons of other faiths to deliver the prayer. *Id.* at 1816–17. Contending that the Establishment Clause mandated legislative prayers be "inclusive and ecumenical" to a "generic God," some town residents sued. *Id.* at 1817.

In reversing the Second Circuit's decision that Greece's practice violated the Establishment Clause, the Supreme Court emphasized again the unique nature of legislative prayer: "legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *Id.* at 1818. Purposeful prayers seeking to solemnly bind legislators are consistent with our tradition where the prayer givers "ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that tradition. These religious themes provide particular means to universal ends." *Id.* Most importantly, history teaches that these solemn prayers "strive for the idea that people of many faiths may be united in a community of tolerance and devotion." *Id.* They are permissible because "[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith." *Id.* at 1823. This tradition extends not just to state and federal legislatures, but also to local legislative bodies. *Id.* at 1819.

Accordingly, the Supreme Court in *Town of Greece* addressed the issue of "whether the prayer practice in the town of Greece fit[] within the tradition long followed in Congress and the state legislatures," and held that it did. *Id.* First, the Court rejected the notion that *Marsh* permits only generic prayers, abrogating *County of Allegheny* and overruling decisions to the contrary. *Id.* at 1820–24. That is, "*Marsh* nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content." *Id.* at 1821. *Marsh* turned not on espousement of "generic theism," but rather on the "history and tradition" showing prayer—even one that is explicitly Christian in tone—"in this limited context could coexist with the principles of disestablishment and religious freedom." *Id.* at 1820 (citation and alteration omitted). Moreover, requiring nonsectarian prayers "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." *Id.* at 1822. Put differently, once the government has "invite[d] prayer into the public sphere," it "must permit a prayer giver to address his or her own

God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.* at 1822–23.  Nonetheless, the Court acknowledged that there are limits:

> If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.
>
> * * *
>
> Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not "exploited to proselytize or advance any one, or to disparage any other, faith or belief."

*Id.* at 1823 (quoting *Marsh*, 463 U.S. at 794–95).

The Supreme Court in *Town of Greece* had little trouble finding the invocation prayers were in keeping with our tradition.  *Id.* at 1824.  Though invoking Jesus and other Christian references, the prayers involved "universal themes" like celebrating the changing of the seasons or calling for a "spirit of cooperation."  *Id.*  To be sure, some prayers went astray of these themes, with one condemning "objectors [to the prayer practice] as a minority who are ignorant of the history of our country" and another "lament[ing] that other towns did not have God-fearing leaders."  *Id.* (quotations omitted).  But these remarks did not "despoil a practice that on the whole reflects and embraces our tradition."  *Id.*  That is, "[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation.  *Marsh* . . . requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer."  *Id.*

The Court also rejected the argument that the town violated the Establishment Clause by inviting predominantly Christian ministers to lead the prayer, noting that the town made reasonable efforts to identify all congregations within its borders and represented that it would welcome a prayer by anyone who wished to give one.  *Id.*  Moreover, the town's composition of nearly all Christians did not "reflect an aversion or bias on the part of town leaders against minority faiths.  So long as the town maintains a policy of nondiscrimination, the Constitution

does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Id.*

Second, the Supreme Court in *Town of Greece* rejected the argument that the intimate nature of a town board meeting—where citizens attend meetings to "accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests"—coerces citizens to support a religion through legislative prayer. *Id.* at 1824–25.

Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, analyzed coercion broadly in the context of the "subtle coercive pressures" the audience might feel while listening to the prayer. He emphasized that "[t]he inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.* at 1825 (Kennedy, J.). It must also be evaluated "against the backdrop of historical practice" and "presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews." *Id.* It is the "lawmakers themselves," not the public, who are the "principal audience for these invocations" as they "may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." *Id.* "For members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree." *Id.* at 1826. And in concluding that "legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate," Justice Kennedy emphasized that "[a]dults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions." *Id.* at 1826–27.

In one paragraph, the three Justices discussed hypothetical facts that could change their *analysis*:

> The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive. . . . Respondents suggest that constituents might feel pressure to join the prayers to avoid irritating the officials who would be ruling on their petitions, but this argument has no evidentiary support. Nothing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined. In no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished. A practice that classified citizens based on their religious views would violate the Constitution, but that is not the case before this Court.

*Id.* at 1826. They also noted the audience had options to avoid the prayers altogether:

> Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in *Marsh*, board members and constituents are "free to enter and leave with little comment and for any number of reasons." Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults, who "presumably" are "not readily susceptible to religious indoctrination or peer pressure."

*Id.* at 1827 (citations omitted).

Justices Thomas and Scalia did not join the coercion section of Justice Kennedy's opinion (Part II-B), but expressly disagreed with it. In a separate opinion, Justice Thomas, joined by Justice Scalia, wrote that coercion is limited to "coercive state establishments" "by

force of law or threat of penalty," such as mandatory church attendance, levying taxes to generate church revenue, barring ministers who dissented, and limiting political participation to members of the established church. *Id.* at 1837 (Thomas, J., concurring in part and in the judgment). Most importantly, Justices Thomas and Scalia rejected Justice Kennedy's broadening of coercion to also include social pressures:

> At a minimum, there is no support for the proposition that the framers of the Fourteenth Amendment embraced wholly modern notions that the Establishment Clause is violated whenever the "reasonable observer" feels "subtle pressure," or perceives governmental "endors[ement]."
>
> * * *
>
> Thus, to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts—not the "subtle coercive pressures" allegedly felt by respondents in this case. The majority properly concludes that "[o]ffense . . . does not equate to coercion," since "[a]dults often encounter speech they find disagreeable[,] and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum." I would simply add, in light of the foregoing history of the Establishment Clause, that "[p]eer pressure, unpleasant as it may be, is not coercion" either.

*Id.* at 1838 (alterations in original and internal citations omitted).

### III.

In the present case, my colleagues refuse to follow *Marsh* and *Town of Greece*, concluding Jackson County's prayer practice falls outside of the traditional understanding of legislative prayer. They do so by setting aside this historical-based analysis, and reviving *Lemon*'s endorsement test based upon three alleged distinctions: the identity of the prayer giver, the lack of non-Christian prayer givers, and the Commissioners' purpose for giving the prayer. I respectfully disagree.

### A.

The Supreme Court has recognized "[w]e are a religious people whose *institutions* presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952) (emphasis added). All three of our branches of government have officially acknowledged religion's role in

American life. *See Lynch v. Donnelly*, 465 U.S. 668, 674–78 (1984) (detailing the "official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders").

Legislative prayer is part of this tradition: "The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Marsh*, 463 U.S. at 786. On this point, the Supreme Court has stated: "[T]he Framers considered legislative prayer a *benign acknowledgment* of religion's role in society." *Town of Greece*, 134 S. Ct. at 1819 (emphasis added). It "has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court' at the opening of [the Supreme Court's (and Sixth Circuit's)] sessions." *Id.* at 1825 (Kennedy, J.). Thus, we must evaluate Jackson County's prayer practice in light of our history, asking whether it "fits within the tradition followed in Congress and the state legislatures." *Id*. at 1819. That tradition includes offering prayers, even those that reflect "beliefs specific to only some creeds," that "seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws." *Id.* at 1823.

Contrary to the majority's approach, the Supreme Court has never taken a granular view of the practice, focusing not on who gives a prayer, but rather whether there is a general practice consistent with our historical traditions. *Marsh*, 463 U.S. at 792–95; *Town of Greece*, 134 S. Ct. at 1819. Absent is any restriction as to *who* may give the prayer in order to be consistent with historical practice. *Marsh*, for example, reasoned that "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of [the First] Amendment." 463 U.S. at 788. The Supreme Court's reasoning omits the majority's qualifier: "opening prayers *by non-governmental officials*." Our history clearly indicates a role for legislators to give prayers before legislative bodies. *See, e.g.*, S. Rep. No. 32-376, at 4 (1853) ("[The founders] did not intend to prohibit a just expression of religious devotion by the legislators of the nation, even in their public character as legislators."); American Archives, Documents of the American Revolutionary Period, 1774-76, v1:1112 (documenting

legislator-led prayer in South Carolina's legislature in 1775); *see also Town of Greece*, 134 S. Ct. at 1833 (Alito, J., concurring) (discussing proposal by Samuel Adams to have a delegate "open the session with a prayer," but which was later opposed on sectarian grounds, not on the grounds that the prayer giver was a delegate).

Indeed, as reflected in the records in *Marsh*, and *Town of Greece*, this history of legislators leading prayers is uninterrupted. Take *Marsh*'s conclusion that "the practice of opening sessions with prayer . . . has been followed consistently in most of the states." 463 U.S. at 789–90. In drawing this conclusion, the Court relied on an amicus brief by the National Conference of State Legislatures ("NCSL"), which surveyed the various practices across the state legislatures. *Id.* at n.11. The NCSL expressly disclaimed the notion that chaplain-only prayers are the norm: "The opening legislative prayer may be given by various classes of individuals. They include chaplains, guest clergymen, *legislators*, and legislative staff members. . . . All bodies, including those with regular chaplains, *honor requests from individual legislators either to give the opening prayer* or to invite a constituent minister to conduct the prayer." Brief of NCSL as Amicus Curiae, *Marsh v. Chambers*, 463 U.S. 783 (1983) (No. 82-83), 1982 WL 1034560, at *2, *3 (emphasis added).

The record in *Town of Greece* also emphasizes the long-standing practice of legislator-led prayer. Observe the prayer offered by one of Greece's councilmen (and one that is quite similar to the prayers offered here):

> Helfer: Please bow your heads and join me in prayer. Heavenly Father we thank you for this day. We thank you for the opportunity to now join together here to conduct the important public business that is before us. We ask that you would guide the decision making and the discussions that take place this evening, and that you would bless each of the participants in the town board as well as all of those who are here in the audience and may be viewing on television. We pray this in your name, amen.

Joint Appendix at 66a-67a, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), 2013 WL 3935056. Other council members offered a silent prayer, directing the audience to "remain standing" and "bow heads" while reflecting upon the September 11, 2001, terrorist attacks and Greece residents who recently passed away. *Id.* at 26a–27a, 29a, 45a, 57a.

Here, Jackson County presented a 2002 NCSL study reinforcing its earlier conclusion that chaplains do not exclusively give opening prayers: "Forty-seven chambers allow people other than the designated legislative chaplain or a visiting chaplain to offer the opening prayer. *Legislators*, chamber clerks and secretaries, or other staff may be called upon to perform this opening ceremony." (emphasis added). More specifically, legislators gave prayers in thirty-one states. The same study notes that *only* members are permitted to deliver prayers in Rhode Island. Closer to Jackson County, for example, the Michigan House of Representatives permits an invocation to "be delivered *by the Member* or a Member's guest." Mich. H.R. R. 16 (emphasis added). So too does Congress. *See, e.g.*, 161 Cong. Rec. S3313 (daily ed. May 23, 2015) (documenting invocation by Oklahoma Senator James Lankford); United States House of Representatives, Office of the Chaplain, Guest Chaplains, http://chaplain.house.gov/chaplaincy/guest_chaplains.html (last visited Feb. 10, 2017) (listing guest chaplains "who have been recommended by the Members of Congress").

Jackson County's prayer practice is consistent with this tradition, and, therefore, the district court correctly ruled Bormuth had not established facts rendering the prayer practice outside the realm of *Marsh* and *Town of Greece*. One of the prayers Bormuth complains about is illustrative of typical prayers given by the Commissioners:

> Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna give you all the thanks and all the praise for all that you do. Lord I wanna remember bereaved families tonight too, that you would be with them and take them through difficult times. We ask these things in your son Jesus's name. Amen.

As in *Town of Greece*, this and other prayers "do not fall outside the tradition [the Supreme Court] has recognized. A number of the prayers did invoke the name of Jesus, the Heavenly Father, or the Holy Spirit, but they also invoked universal themes," 134 S. Ct. at 1824, such as asking for guidance to "make good decisions that will be best for generations to come," and to express well-wishes to military and community members. There is no evidence that the prayers "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion" or

that there is a "pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose." *Id.* at 1823, 1824.

There is a bit of irony in the majority opinion's per se condemnation of legislator prayer. The purpose of legislative prayer is to "invite[] lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing." *Id.* at 1823. As Justice Kennedy recognized, legislative prayer exists "largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers." *Id.* at 1826 (Kennedy, J.). It "reflect[s] the values [public officials] hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree." *Id.* As one of Jackson County's Commissioners stated, "Commissioners, as individuals, have a right to pray as we believe."

Preventing Jackson County's Commissioners from giving prayers of their own choosing detracts from their ability to take "a moment of prayer or quiet reflection [to] set[] the[ir] mind to a higher purpose and thereby ease[] the task of governing." *Id.* *Town of Greece* tells us that "government must permit a prayer giver to address his or her own God or gods as conscience dictates," and that it is not the role of the judiciary to act "as [a] supervisor[] and censor[] of religious speech." *Id.* at 1822. That is exactly the role the majority assumes by finding an appreciable difference between legislator-led and legislator-authorized prayer.

B.

The majority opinion jettisons the historical overlay, and instead applies, in effect, the inapplicable *Lemon* test. It tells us, for example, that because the Commissioners give the prayers, "there is no distinction between the government and the prayer giver: they are one and the same." Accordingly, Jackson County is "effectively endorsing a specific religion" because all of the commissioners were "Christian." In doing so, it misconstrues the facts and Supreme Court precedent.

1.

Noticeably absent from the majority's opinion is any acknowledgment that Jackson County's invocation practice is facially neutral regarding religion. In Jackson County, on a rotating basis, each elected Commissioner, regardless of his or her religion (or lack thereof), is afforded an opportunity to open a session with a short invocation based on the dictates of his own conscience. Neither other Commissioners, nor the Commission as a whole, review or approve the content of the invocations.

The majority finds it significant that at the time of the sessions referenced in plaintiff's complaint, all the elected Jackson County Commissioners were "Christian." While all the Commissioners presumably believed in Jesus Christ, the faiths of Christianity are diverse, not monolithic. The Reformation of the Fifteenth Century spawned an explosion of these diverse Christian faiths. Many of those practicing these new Christian faiths sought religious freedom in America and found refuge from the tyranny inflicted by sectarian governments. To guarantee religious liberty to all persons, including those practicing the emerging Christian religions, the drafters and ratifiers of the First Amendment of our Constitution provided:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof.

U.S. Const. amend. I.

My colleagues do not know the religious faiths of the 2013-2014 Jackson County Commissioners. Nor does the majority know the religious faiths of the current Commissioners. In this regard, the religious allegiance of the members of the Commission is subject to change with each election cycle. A process, of course, that guarantees, "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const. art. VI, cl. 3. With each election, the people of Jackson County may elect a Commissioner who is Muslim, Buddhist, Hindu, Jewish, Mormon, Roman Catholic, Eastern Orthodox Christian, Baptist, Methodist, Presbyterian, Lutheran, Episcopalian, Congregationalist, Quaker, Amish, Mennonite, Pentecostal, "Animist," Pagan, Atheist, Agnostic, and so on. The religious faiths of the periodically elected officials—including Jackson County's Commissioners—are dynamic, not static. In fact, east of Jackson County is the City of Hamtramck, Michigan, which just

elected a Muslim majority city council.[2]   Were Mr. Bormuth elected to the Jackson County Board of Commissioners, under the religious-neutral Jackson County legislative prayer practice, he could freely begin a legislative session with a prayer of his choosing—to "Mother Earth," the sun, the moon (or otherwise).

2.

The conclusion in the majority opinion that Jackson County is "effectively endorsing a specific religion" is one borne out of *Lemon*, not *Marsh* or *Town of Greece*.   Yes, the prayer giver and the government may be "one and the same," but religious endorsement is a thread woven by the *Lemon* test.   *Smith*, 788 F.3d at 587 (explaining that "the Sixth Circuit 'has treated the endorsement test as a refinement or clarification of the *Lemon* test'") (citation omitted).   If *Lemon* applied, whether the prayer givers and the government are "one and the same" (read, "excessive entanglement") could go to endorsement of religion.   But as the majority properly concludes in a later footnote, *Lemon* does not control this case.[3]   Neither *Marsh* nor *Town of Greece* speak in *Lemon*'s terms—i.e., balancing purposes and government entanglement—when examining the constitutionality of legislative prayer.   In viewing Jackson County's prayer practice through an endorsement rubric in lieu of through history and tradition, the majority effectively rewrites over thirty-plus years of Supreme Court jurisprudence—applying the *Lemon* rule instead of *Marsh*'s exception.   *See Town of Greece*, 134 S. Ct. at 1818 ("*Marsh* is sometimes described as carving out an exception to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry.") (internal quotation marks and citation omitted).[4]

---

[2]*See* Kris Maher, *Muslim-Majority City Council Elected in Michigan*, Wall St. J, Nov. 9, 2015, http://www.wsj.com/articles/muslim-majority-city-council-elected-in-michigan-1447111581.

[3]I also concur with the majority's rulings that the Treaty of Tripoli does not govern this matter and that Bormuth does not have standing to assert his Pledge-of-Allegiance argument on behalf of other children.

[4]Query whether even the *Lemon*-test supports the majority's reasoning, for the Supreme Court has told us in that context that "prayers by legislators do not insistently call for religious action on the part of citizens." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 877 n.24 (2005).

For example, the majority opinion reasons Jackson County is "effectively endorsing a specific religion" because the Commissioners are all themselves of Christian faith. This does not comport with *Marsh*, where the Supreme Court sanctioned the practice of selecting the same Presbyterian clergyman for sixteen consecutive years. 463 U.S. at 793. It also conflicts with *Town of Greece*, which held that "[p]rayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not 'exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" 134 S. Ct. at 1823 (quoting *Marsh*, 463 U.S. at 794–95). Thus, the district court correctly concluded that the all-Christian makeup of the Commissioners is "immaterial":

> As elected officials, they were chosen as representatives whose interests were most closely aligned with the public's, and their personal beliefs are therefore a reflection of the community's own overwhelmingly Christian demographic. . . . [T]he future may bring Commissioners of more diverse religious backgrounds who will deliver invocations in those traditions. To hold otherwise would contravene Marsh's sanction of legislative prayer delivered for sixteen years by a single Presbyterian clergyman.

(internal citations omitted). This reasoning also aptly applies *Town of Greece*'s express command that legislative bodies "must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.* at 1822.

Jackson County is also not required to provide "opportunities for persons of other faiths" to offer invocations. Just like Greece, Jackson County maintains a facially-neutral prayer policy. *Id.* at 1824. The majority discards this similarity, telling us instead that the Supreme Court upheld the prayer practice in *Town of Greece* "in large part because it included prayers representing a variety of faiths." In no part did *Town of Greece* depend upon religious heterogeneity. Its holding on this point is that "[s]o long as the town maintains a policy of nondiscrimination," the Establishment Clause does not mandate a municipality of predominately one faith to "achieve religious balancing." *Id.* Contrary to the majority's assertion, Jackson County's prayer policy *permits* prayers of any—or no—faith, and the County need not adopt a different policy as part of a "quest to promote a diversity of religious views." *Id.* (internal quotation marks omitted). However, my colleagues "require the [County] to make . . . judgments

about the number of religions it should sponsor and the relative frequency with which it should sponsor each." *Id.* (alterations and citation omitted). But as *Town of Greece* commands, such "judgments" are "wholly inappropriate." *Id.* (citation omitted).

Nor does it matter that the Commissioners' invocations "are literally 'governmental speech.'" A public official need not be the one giving a prayer in order for the Establishment Clause to apply. *Cf. Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) ("A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message."). An official chaplain (*Marsh*), invited members of the community (*Town of Greece*), and county commissioners (this case) are all government speakers when giving their respective prayers. Under the majority's theory, prayers by agents (like in *Marsh* and *Town of Greece*) are somehow constitutionally different than prayers offered by principals. The Establishment Clause does not tolerate, much less require, such mechanical line drawing. *Cf. Lynch*, 465 U.S. at 678–79 ("The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test."); *see also Simpson v. Chesterfield Cty. Bd. of Sup'rs*, 404 F.3d 276, 289 (4th Cir. 2005) (Niemeyer, J., concurring) (stating in a pre-*Town of Greece* case that "when members of a governmental body participate in a prayer for themselves and do not impose it on or prescribe it for *the people*, the religious liberties secured *to the people* by the First Amendment are not *directly* implicated, and the distinct, more tolerant analysis articulated in *Marsh* governs").[5]

---

[5]Pre-*Town of Greece* case law from other circuits (some albeit abrogated because they relied on the notion that prayers must be ecumenical) supports the conclusion that the prayer giver's identity is not dispositive under the *Marsh* analysis. In a line of legislative prayer cases, the Fourth Circuit, for example, has characterized this position as "miss[ing] the forest for the trees." *Joyner v. Forsyth Cty.*, 653 F.3d 341, 350 (4th Cir. 2011) ("It [is] the governmental setting for the delivery of . . . prayers that court[s] constitutional difficulty, not those who actually gave the invocation."); *see also Simpson*, 404 F.3d at 286 ("The Court, neither in *Marsh* nor in *Allegheny*, held that the identity of the prayer-giver, rather than the content of the prayer, was what would affiliate the government with any one specific faith or belief.") (quotations and alterations omitted). And retired Justice O'Connor, sitting by designation, authored an opinion holding that prayers *only* given by city council members were permissible. *See Turner v. City Council of City of Fredericksburg*, 534 F.3d 352, 355–56 (4th Cir. 2008). Other circuits are in accord. *See Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1281 (11th Cir. 2008) (listing "the identity of the speaker" as one of many factors to consider); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1233 (9th Cir. 1998) (en banc) ("[T]here can be no Establishment Clause violation merely in the fact that a legislative body chooses not to appoint a *certain person* to give its prayers.") (emphasis added).

Finally, the majority relies on statements by Commissioner Rice to conclude Jackson County desired to control prayer content. There are several problems with this conclusion. As set forth in much more detail in Part IV-B-1 of this opinion, the most important is that these statements fall within those prohibited from consideration by our appellate review principles. They are lifted from a November 12, 2013, meeting that Bormuth neither directed the district court to below, nor raised in his appellate brief to us. Bormuth has thus waived any argument as to these statements. *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Even if we were to consider these statements, they do not support the majority's reasoning. In *Town of Greece*, the Court rejected the notion that isolated objectionable prayers— those given by ministers who "disparaged those who did not accept the town's prayer practice"—voided the entire practice. 134 S. Ct. at 1824. Plucking stray examples, concluded the Court, "do[es] not despoil a practice that on the whole reflects and embraces our tradition." *Id*. Only upon presentment of "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose" will "a challenge based solely on the content of a prayer"—here, the limiting of the prayer giver's identity to elected officials who happen to all be one faith—likely succeed. *Id.*

Moreover, this use flies in the face of guidance eschewing examining the minds of individual legislators as it relates to legislative intent: "a judiciary must judge by results, not by the varied factors which may have determined legislators' [actions]. We cannot undertake a search for motive in testing constitutionality." *Daniel v. Family Sec. Life Ins. Co.*, 336 U.S. 220, 224 (1949); *see also Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) ("In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies.") (footnote omitted). Rather, we must heed the Supreme Court's admonition that "[i]nquiries into [legislative] motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). This is a concern, I might add, that the Court has emphasized in Establishment Clause cases, which are to be reviewed objectively, "without any judicial psychoanalysis of a drafter's heart of hearts."

*McCreary Cty.*, 545 U.S. at 862.  Stated differently, "Establishment Clause analysis does not look to the veiled psyche of government officers."  *Id.* at 863.[6]

In sum, the record before us is one that fits neatly within the legislative invocation jurisprudence as set forth by the Supreme Court in *Marsh* and *Town of Greece*.

## IV.

I also disagree with the majority's second holding—that even if Jackson County's prayer practice fits within the legislative prayer exception, it is unduly coercive.

## A.

The majority opinion applies Part II-B of Justice Kennedy's opinion as if it were the opinion of the Court.  It is not.

On the issue of coercion, the *Town of Greece* decision produced a majority result, but not a majority rationale.  Under these circumstances, *Marks v. United States* provides that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . ."  430 U.S. 188, 193 (1977) (citation omitted). "Taken literally, *Marks* instructs lower courts to choose the 'narrowest' concurring opinion and to ignore dissents."  *United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009) (citation omitted).  That is, we take the "one which relies on the 'least' doctrinally 'far-reaching-common ground' among the Justices in the majority."  *Id.* at 209 (citation omitted).

Justice Thomas's concurring opinion (joined by Justice Scalia) is "a logical subset" of Justice Kennedy's opinion, *see, e.g.*, *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009), and is the "narrowest" ground of the judgment.  Therefore, Justice Thomas's opinion is controlling under *Marks*.  In his concurrence, Justice Thomas traced the historical roots of coercion to "coercive state establishments"—coercion only *"by force of law and threat of*

---

[6]The majority also takes these statements out of context.  During that meeting, Jackson County's administrator proposed a policy (in response to this litigation) that allowed clergy to present opening prayers.  Rice's statements are made within the context of *who is defined* as one who can present the prayer *after* being advised by the administrator that the policy seeks to codify a nondiscriminatory selection of clergy: i.e., the Board cannot "give direction" as to what kind of prayer can be offered and that "[t]hey can say whatever they want to say." http://tinyurl.com/2013nov12 (29:30, 32:00).

*penalty*." 134 S. Ct. at 1837 (Thomas, J., concurring in part and in the judgment). This would include, for example, mandatory church attendance, levying taxes to generate church revenue, barring ministers who dissented, and limiting political participation to members of the established church. *Id.*

In the instant case, the majority reasons to the contrary, claiming that Justice Kennedy's coercion test applies because it "offers the least change to the law." This is so, they argue, because Justice Kennedy cites concurring and plurality opinions while Justice Thomas relies upon dissents (and concurrences where there were controlling majority or plurality opinions). From this, my colleagues conclude that Justice Thomas's concurrence "does not cite any controlling law to support" his theories and, therefore, is not the "opinion that offers the least change to the law."

As the majority opinion admits, this premise is faulty: "the precise role of coercion in an Establishment Clause inquiry is unclear, *especially within the context of legislative prayer.* In that sense, both Justice Kennedy's and Justice Thomas's opinions *involve at least some departure from the state of the law* as it existed before *Town of Greece*." (emphasis added). This puts it mildly. *Marsh* "carv[ed] out an exception" to the Supreme Court's Establishment Clause jurisprudence. *Id.* at 1818 (citation omitted). This is "because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured [the Establishment Clause] inquiry." *Id.* (internal quotation marks and citation omitted). *Marsh* took no effort to evaluate legislative prayer through a coercive lens, and it did so over Justice Brennan's dissenting opinion, which advocated *for* a coercion analysis. 463 U.S. at 798 (Brennan, J., dissenting) (discussing "indirect coercive pressure upon religious minorities to conform" in the context of the *Lemon* test).

*Town of Greece* introduces coercion as an element to legislative prayer cases for the first time. There is no dispute that Chief Justice Roberts, Justice Kennedy, and Justice Alito agree that legal coercion constitutes coercion. On this, a majority of Justices agree. However, Justice Kennedy's position offers *more* of a change in the law because his opinion would introduce a broader coercion analysis—as compared to Justice Thomas—where one never existed.

Fundamentally, *Marks* may not be used to create the fiction of Justices Thomas and Scalia joining the portion of Justice Kennedy's opinion to which they expressly disagreed. The rationale of *Marks* that a Justice implicitly agrees with a more narrow holding is inapposite to the positions of Justices Thomas and Scalia in *Town of Greece* who did not implicitly agree with Part II-B of Justice Kennedy's opinion, but expressly disagreed with it in a separate, concurring opinion. For these reasons, the majority errs in applying Justice Kennedy's test of coercion.

Under Justice Thomas's opinion, Bormuth's challenge easily fails. (In fact, he makes no such argument to the contrary.) Bormuth only raises "subtle coercive pressures" which do not remotely approach rising to "actual legal coercion." 134 S. Ct. at 1838 (Thomas, J., concurring in part and in the judgment). This resolves the issue in the County's favor.

B.

Furthermore, even if Part II-B of Justice Kennedy's opinion were precedent, it does not change the result in the present case. Under Justice Kennedy's proposed rule, we presume that a "reasonable observer . . . understands that . . . [the] purpose[ of legislative prayer is] . . . to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews." *Id.* at 1825 (Kennedy, J.). That we permit legislative prayer "does not suggest that those who disagree"—like Bormuth—"are compelled to join the expression or approve its content"—as Bormuth admits he is not. *Id.*; *see also id.* at 1827 ("But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate."). Whether a legislative prayer practice rises to the level of coercion "remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.* at 1825; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) ("Whether a government activity violates the Establishment Clause is 'in large part a legal question to be answered on the basis of judicial interpretation of social facts. Every government practice must be judged in its unique circumstances.'" (alteration and citation omitted)).

1.

I begin with what should always shape our cases:  the record on appeal.  The majority relies heavily on a video—a recording of a November 12, 2013, meeting of a subset of the Board—to draw its conclusions.  To be sure, Jackson County records its Board of Commissioners' meetings and makes these videos available online on its website.[7]  However, the simple fact is that Bormuth did not present this video, or any other, to the district court.  One need look no further than the opinions of the magistrate judge and district judge to confirm these newly found facts were not presented below.  Like the parties' briefing, those opinions touch only on the prayers' content and make no such reference to the videos.  Yet, at the suggestion not by Bormuth, but by Amicus on appeal, the majority has elected to expand the record.  By relying upon these videos, the majority ignores a fundamental appellate principle:  we cannot fault a district court for failing to address facts that were not before it.

"Our review of a district court's summary-judgment ruling is confined to the record." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 765 (6th Cir. 2015) (en banc).  Under Rule 56(c), the opposing party "has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."  *Chicago Title Ins.*, 487 F.3d at 995 (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).  "This burden to respond is really an opportunity to assist the court in understanding the facts.  But if the non-moving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered."  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992).  Simply stated, we "will not entertain on appeal factual recitations not presented to the district court when reviewing a district court's decision."  *Chicago Title Ins. Corp.*, 487 F.3d at 995 (internal citation omitted); *cf. United States v. Crumpton*, 824 F.3d 593, 614 n.6 (6th Cir. 2016) (Moore, J.) (declining to consider a video introduced at trial and played for the jury in part because "[t]he video was not made part of the district court's record").  And this rule applies even if an appellant proffers evidence "that might . . . show a genuine issue of material fact after the district court had granted the defendants' motion for summary judgment." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 491 (6th Cir. 2000).

---

[7]https://www.co.jackson.mi.us/1673/Board-of-Commissioners

The majority opinion wholly ignores this well-established appellate principle, burying a footnote toward the end of its opinion stating that the videos were "part of the record before the district court." Its only plausible support for this assertion is that Bormuth's Amended Complaint averred that "[t]he County commissioners meetings are video recorded and posted on the Jackson County website: www.co.jackson.mi.us," and that a transcription of the offered prayers attached to his motion for summary judgment also referenced the videos' availability. In my view, the mere reference to the videos' general availability falls well short of "direct[ing] the court's attention to those specific portions of the record upon which [Bormuth sought] to rely to create a genuine issue of material fact." *Chicago Title Ins. Corp.*, 487 F.3d at 995. But in the majority's view, such fleeting references somehow required the district court to spend countless hours litigating on Bormuth's behalf in response to Jackson County's motion for summary judgment by: (1) surfing the County's website to find the archive of the meetings; (2) watching the several years' worth of monthly meetings (and as but one example, the November 12, 2013, Personnel & Finance Committee meeting alone lasted over one hour); and (3) finding facts supporting Bormuth's claim. We never require such advocacy by a district court, whether it be for a pro se litigant like Mr. Bormuth, or otherwise. *See*, *e.g.*, *Guarino*, 980 F.2d at 410 (a district court is not obligated to "comb the record from the partisan perspective of an advocate for the non-moving party"); *cf. Pliler v. Ford*, 542 U.S. 225, 231 (2004) ("District judges have no obligation to act as counsel or paralegal to *pro se* litigants.").**8**

There is yet another appellate procedure problem unresolved by the majority opinion. Outside of repeating the above statement from his Amended Complaint, Bormuth's appellate brief is similarly silent with respect to the videos or their content. It is only in his reply on appeal—i.e., after reviewing Amicus's briefing raising these additional materials—that he first referenced the videos and made an argument regarding the new facts contained therein. "We have consistently held, however, that arguments made to us for the first time in a reply brief

---

**8**The majority also relies upon Bormuth's response to Jackson County's motion for summary judgment, but that response makes no reference to the videos or their express content. Noticeably absent are the statements referenced by the majority regarding controlling prayer content, the content of other meetings, and calling Bormuth a "nitwit." Finally, the majority incorrectly states Jackson County admitted at oral argument that the videos were part of the "official record" before the district court. Rather, counsel stated the videos were part of the *County's* official public records.

are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). "[W]here the facts relied upon were presented neither to the district court nor to this Court until Plaintiff Appellant filed his reply, it would be improper for the Court to find that the district court erred in its failure to consider this newly-developed . . . argument," *Overstreet*, 305 F.3d at 578, especially, as it is here, "when the issue raised for the first time in reply is based largely on the facts and circumstances of the case." *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986).

The problem becomes magnified when considering the majority's irreconcilable decision to use these new facts, but yet rightfully rejects Amicus's argument regarding prayer purpose (based upon yet another video) because Bormuth did not raise that argument below or in his appellate brief. There is no difference between this newly raised argument based on evidence not presented to the district court that the majority rejects, and the newly raised argument based on evidence not presented to the district court that the majority accepts. This dichotomy is unexplainable.

Based upon its expanded record, the majority concludes Jackson County's prayer practice is coercive under Justice Kennedy's test. I respectfully disagree.

2.

In this regard, I concur with District Judge Marianne O. Battani's ruling that Jackson County's invocation practice is not coercive:

> The Court is not persuaded that the legislative prayer at issue here is unduly coercive based on the identity of the prayer-giver. As a practical matter, nonadherents had several options available to them: leave for the duration of the prayer; remain for the prayer without rising; or remain for the prayer while rising, in which case their acquiescence would not have been interpreted as agreement with the religious sentiments. It is not clear that the direction to "Please rise" carries more coercive weight when voiced by the Commissioners themselves than by a guest chaplain selected by the Board of Commissioners. Although nonadherents to Christianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not. The language in *Greece* regarding requests to participate in prayer being made by legislators does not provide clear guidance on

the outcome of this case—it is dicta contained in a plurality opinion and is therefore not binding. Additionally, the opinion states merely that "[t]he *analysis* would be different," not that the *outcome* would be different had the instruction to rise been delivered by one of the legislators. Bormuth's attestation that two Commissioners turned their backs to him during his presentations, while evidence of disrespect, does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer—rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited by his sentiments.

* * *

[I]f the Court determined that the constitutionality of a legislative prayer is predicated on the identity of the speaker, potentially absurd results would ensue. Under such a holding, an invocation delivered in one county by a guest minister would be upheld, while the identical invocation delivered in another county by one of the legislators would be struck down. In light of these considerations, the Court finds that the present legislative prayer practice is not coercive.

### 3.

My colleagues rule to the contrary, concluding that we must view coercion differently from prayers at legislative sessions because local government meetings are small, intimate, and often involve citizens "address[ing] issues immediately affecting lives." To be sure, this difference was at the core of an opinion in *Town of Greece*: Justice Kagan's dissent. 134 S. Ct. at 1851–52 (Kagan, J., dissenting) ("The majority thus gives short shrift to the gap—more like, the chasm—between a legislative floor session involving only elected officials and a town hall revolving around ordinary citizens."). However, the five Justices in the *Town of Greece* majority did not adopt these distinctions. For this reason, my colleagues err in finding hypothetical coercion because "residents would not want to offend the local government officials they are petitioning."

The majority opinion in the present case also makes much of the fact that Commissioners asked audience members to stand and assume a reverent position before giving the prayers. This point of distinction from *Town of Greece* leads my colleagues to rely upon this passage from Part II-B of Justice Kennedy's opinion:

> The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that

their decisions might be influenced by a person's acquiescence in the prayer opportunity. . . . Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive.

*Id.* at 1826 (Kennedy, J.). The analytical fallacy of focusing on this list of distinctions is that it ignores that "[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith"; and that a reasonable person understands that the purpose of legislative prayer is "to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews." *Id.* at 1823, 1825. Bluntly, "[t]hat many appreciate these acknowledgments of the divine in our public institutions does not suggest that those who disagree are compelled to join the expression or approve its content." *Id.* at 1825. As the district court stated, "[a]lthough nonadherents to Christianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not." The majority's application thus flips Justice Kennedy's presumption against Jackson County, not in its favor.

And more importantly, just as in *Town of Greece*, "[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest." *Id.* at 1827. (Commissioner Rice even suggested as much.) Bormuth admits that he refused to stand for the prayers and his "quiet acquiescence [should] not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." *Id.* On this record, I refuse to equate these "commonplace" and "reflexive" requests as mandating prayer participation. *Id.* at 1832 (Alito, J., concurring) (noting, among other things, that the words "Let us pray" are "commonplace" and "reflexive").

There is also nothing in the record indicating that the Commissioners treated Bormuth differently on account of his complaints regarding the prayer practice. That record is: two Commissioner's comments regarding the draft prayer policy, and one turning his back on Bormuth when he criticized the sectarian prayer practice.[9] On the former, the statements discussing "attacks" on Jesus Christ and the Commissioners are in the context of an individual's right to offer a prayer of his or her faith, without preclearance by "an administrator or judge": "Bormuth is attacking us and, from my perspective, my Lord and savior Jesus Christ. Our civil liberties should not be taken away from us, as Commissioners"; "We Commissioners, as individuals, have a right to pray as we believe"; and "What about my rights?" *See id.* at 1823. And on the latter, I agree with the district court that however uncourteous, a Commissioner turning his back to Bormuth one time certainly does not constitute "strong criticism or disapproval." *Opprobrium*, Black's Law Dictionary (10th ed. 2014).

That leaves us with the majority opinion's final conclusion: Jackson County allocated benefits and burdens due to Bormuth's objection to its prayer practice by not appointing him to the Solid Waste Planning Committee or the Board of Public Works. Taking the facts that were properly before the district court (including those proposed in Bormuth's second motion to supplement),[10] I do not agree.

Beyond a template rejection letter, we know nothing about why Jackson County rejected Bormuth's application to fill a vacancy on the Solid Waste Planning Committee. All we have are unverified assertions from his complaint. But in order to defeat Jackson County's motion for summary judgment, Bormuth was required to go "beyond the pleadings" and "do more than simply show that there is some metaphysical doubt as to material facts to survive summary

---

[9]Citing comments from the November 12, 2013, Personnel & Finance Committee meeting, the majority concludes Jackson County singled Bormuth out for opprobrium. These comments were, of course, not presented to the district court and were not raised by Bormuth in his appellate brief and, therefore, are not properly before us.

[10]Given this, I disagree with the majority opinion's conclusion that the district court abused its discretion by denying Bormuth's second motion to supplement.

judgment." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 270 (6th Cir. 2010) (citation omitted).[11]

We know slightly more with respect to his application for an appointment to the Board of Public Works. Bormuth contends he was "the most qualified applicant," yet the Commissioners appointed an individual who had run against one of the Commissioners. The Commissioners told Bormuth that they appointed the other person because he "was a former township supervisor who was involved with setting up a township recycling station and that his experience with recycling was the focus of his appointment." Bormuth contends that he was more qualified than this person: "I was the primary person working for the closure of the JCRRF [Jackson County Resource Recovery Facility]"; "I have been one of the primary voices seeking to maximize recycling in Jackson County before the Solid Waste Planning Committee"; "I am the reason Jackson County now has a part time recycling coordinator to gather numbers on recycling volumes within the County"; and "I had been dialoguing with Commissioner Duckham on ways to get glass used as a recycled material in our roads." Bormuth was "incredulous" about the appointment of another individual and therefore drew the conclusion that "the Commissioners will not grant an appointment to anyone who does not believe in the evil scum jesus [sic] story."

It is an evidentiary supposition to suggest, as the majority does, that, as a matter of law, "the County's decision not to nominate [Bormuth] . . . suggests that the Board of Commissioners was denying benefits to residents based on their beliefs." Other than Bormuth's attestation that he was "the most qualified applicant," there is nothing in the record linking the refusal to appoint Bormuth to the Board of Public Works to his objection to the prayer policy. Bormuth even admits he was told that the candidate selected had prior governmental experience in setting up a recycling station. Without more facts about the selection process, this court should not, as a matter of law, draw the conclusion made by the majority.

---

[11]Citing Bormuth's initial disclosures, the majority invents the argument that Bormuth sought to depose the Commissioners for more information about Bormuth's efforts to close the Jackson County Resource Facility. The record shows, however, that in response to the County's motion to quash these depositions, he made no such argument and instead focused solely on Jackson County's prayer practice and the individual Commissioners' intent in giving prayers. As set forth in the text, individual Commissioners' intent is not pertinent to our inquiry. For these reasons, the majority wrongly concludes the district court erred in quashing Bormuth's deposition notices for the Commissioners.

V.

I note my view as to the constitutionality of Jackson County's invocation practice is consistent with the Fourth Circuit's recent opinion in *Lund v. Rowan County*, 837 F.3d 407 (4th Cir. 2016).[12] Rowan County's invocation practice is remarkably similar: the Rowan County Board opens its sessions with a commissioner-led invocation; the content of each invocation is at each commissioner's discretion, without preclearance by the board as a whole; the invocations have predominantly Christian tones; the commissioners typically say "let us pray" or "please pray with me" before giving the invocations; and members of the public who object to the practice can leave before, arrive after, or remain without participation. *Id.* at 411, 413.

In *Lund v. Rowan County*, the Court of Appeals for the Fourth Circuit held that this practice was consistent with the Supreme Court's legislative prayer jurisprudence. First, it rejected the argument that the identity of the prayer giver is dispositive because "the Supreme Court attached no significance [in *Marsh* and *Town of Greece*] to the speakers' identities in its analysis and simply confined its discussion to the facts surrounding the prayer practices before it." *Id.* at 418. Rather, and relying upon some of the same historical documents I reference, the Fourth Circuit concluded "the very 'history and tradition' anchoring the Supreme Court's holding in *Town of Greece* underscores a long-standing practice not only of legislative prayer generally but of lawmaker-led prayer specifically."[13] *Id.* And as the Fourth Circuit aptly points out, this historical practice makes sense in light of legislative prayer's purpose—"If legislative prayer is intended to allow lawmakers to 'show who and what they are' in a public forum, then it stands to reason that they should be able to lead such prayers for the intended audience: themselves." *Id.* at 420.

Second, the Fourth Circuit highlighted four "guideposts for analyzing whether a particular practice goes beyond constitutional bounds": the selection of the content; the content; the selection of the prayer giver; and whether over time the practice conveys the view that the

---

[12]I recognize the Fourth Circuit is reconsidering *Lund* en banc, but still find its reasoning to be persuasive.

[13]On this point, even the dissenting judge in *Lund* agreed. 837 F.3d at 432–33 (Wilkinson, J., dissenting) ("As the majority . . . rightly remind[s], there exists a robust tradition of prayers delivered by legislators.").

government advanced one religion over other creeds. *Id.* at 420–25. Each of these are just as applicable to Jackson County's practice.

*Selection of the content.* Just like the majority here, the district court in *Lund* found commissioner-led prayers amounted to government supervision of prayer. *Id.* at 420. The Fourth Circuit disagreed, emphasizing that individual commissioners could "give[] their own prayer without oversight, input, or direction" from the board. *Id.* Put another way, "each commissioner is a free agent like the ministers in *Town of Greece* and the chaplain in *Marsh* who gave invocations of their own choosing." *Id.* at 421. Moreover, there was no evidence indicating the prayers given were "anything but a personal creation of each commissioner acting in accord with his or her own personal views." *Id.* So too in Jackson County.

*The content*. As here, the content of the invocations given before Rowan County's Board of Commissioners "largely encompassed universal themes, such as giving thanks and requesting divine guidance in deliberations. . . . There [wa]s no prayer in the record asking those who may hear it to convert to the prayer-giver's faith or belittling those who believe differently." *Id.* at 422. The illustrative prayer given by the Fourth Circuit is universal, and neither proselytizes nor disparages:

> Let us pray. Father we do thank you for the privilege of being here tonight. We thank you for the beautiful day you've given us, for health and strength, for all the things we take for granted. Lord, as we read the paper today, the economic times are not good, and many people are suffering and doing without. We pray for them; we pray that you would help us to help. We pray for the decisions that we will make tonight, that God, they will honor and glorify you. We pray that you would give us wisdom and understanding. We'll thank you for it. In Jesus' name. Amen.

*Id.* This prayer, as with the prayers about which Bormuth complains, "comes nowhere near the realm of prayer that is out of bounds under the standards announced in *Town of Greece*." *Id.*

*The selection of the prayer giver*. As does the majority opinion for Jackson County, the district court in *Lund* faulted Rowan County for failing to promote religious diversity by only permitting commissioners to give invocations. *Id.* at 423. I agree with our sister circuit's response to this point—"[D]iversity among the beliefs represented in a legislature has never been the measure of legislative prayer." *Id.* Rather, *Town of Greece* makes clear that legislative

bodies need not "promote a diversity of religious views." *Id.* (citing *Town of Greece*, 134 S. Ct. at 1824). Accordingly, "[a]bsent proof the Board restricted the prayer opportunity among the commissioners as part of an effort to promote only Christianity, we must view its decision to rely on lawmaker-led prayer as constitutionally insignificant." *Id.* at 424. This is especially true given that—just like Jackson County's practice—"[a] person of any creed can be elected to the Board and is entitled to speak without censorship." *Id.*

*Advancement of one religion over other creeds.* The Fourth Circuit concluded that Rowan County's prayer practice did not, over time, advance Christianity over other creeds. *Id.* at 424–25. The invocations offered before Rowan County were "largely generic petitions to bless the commissioners before turning to public business. . . . Had a chaplain offered prayers identical to those [in *Lund*], *Town of Greece* and *Marsh* would unquestionably apply to uphold the Board's practice." *Id.* at 425. "In other words, the degree of denominational preference projected onto the government with lawmaker-led prayer is not significantly different from selecting denominational clergy to do the same. Both prayers arise in the same context and serve the same purpose." *Id.* The same is true in the present case.

Third, the Fourth Circuit found that Rowan County's practice was not impermissibly coercive. Preliminarily, it rejected the district court's view that the Supreme Court's prior coercion cases are applicable to legislative prayer cases, emphasizing the unique nature of this area of the law. *Id.* at 427 ("[L]egislative prayer [is] a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines.") (citation omitted). The Fourth Circuit did not address the *Marks* issue, however. Instead, it recognized "that the Board clearly did not engage in coercion under the view expressed by Justices Scalia and Thomas," but nonetheless gave the plaintiffs the benefit of the doubt by also applying Justice Kennedy's plurality opinion. *Id.*

Even under Justice Kennedy's "more favorable" standard, the Court of Appeals for the Fourth Circuit held that the plaintiffs failed to demonstrate coercion. *Id.* In large part, the Fourth Circuit emphasized the voluntariness of participating in the prayers, especially when evaluated in light of the fact that "[a]dults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront

from the expression of contrary religious views." *Id.* (quoting *Town of Greece*, 134 S. Ct. at 1826 (Kennedy, J.)); *see also id.* at 428–29. Just like Bormuth, who admits he did not participate in Jackson County's prayers, citizens attending Rowan County Board of Commissioner meetings "who found the prayer unwanted had several options available – they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating." *Id.* at 428. And the same is true with why the Rowan County Commissioners' requests to stand and pray before the giving of an invocation does not constitute coercion: viewing this "routine courtesy" through the lens of legislative prayer's purpose "'to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens,' . . . no reasonable person would interpret the commissioners' commonplace invitations as government directives commanding participation in the prayer." *Id.* at 429–30 (quoting *Town of Greece*, 134 S. Ct. at 1826 (Kennedy, J.)).[14]

Finally, whether the *Lund* majority's opinion will stand as a matter of Fourth Circuit precedent will soon be decided. I take exception to my colleagues following Judge Wilkinson's suggestion that public entities mandate non-denominational prayers and diverse prayer givers, or even offer a prophylactic "Message of Religious Welcome," in order to cure any perceived Establishment Clause problems. *See id.* at 437–38 (Wilkinson, J., dissenting). This suggestion, as discussed, runs headlong into *Marsh* and *Town of Greece*—the constitutionality of legislative prayer does not turn on content neutrality, prayer-giver diversity, or advance trigger warnings, for one "may safely assume that mature adults, like [Bormuth himself admits], can follow such contextual cues without the risk of religious indoctrination." *Id.* at 430.

## VI.

For these reasons, I respectfully dissent. I would affirm the judgment of the district court.

---

[14]Moreover, the Fourth Circuit rejected the plaintiffs' claim that they were singled out for opprobrium based upon several statements by commissioners that "were critical of those in the religious minority": "[s]uch isolated incidents do not come close to showing . . . 'a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose.'" *Id.* at 430 (quoting *Town of Greece*, 134 S. Ct. at 1824). These statements—"I am sick and tired of being told by the minority what's best for the majority. My friends, we've come a long way—the wrong way. We call evil good and good evil," for example—are akin to those the majority relies upon in the present case. *Id.*